Appeal by National Security Fire Casualty Company and National Security Insurance Company (National) from an adverse judgment in an action brought by Stanley R. Bowen. We reverse and remand.
The cause grew out of Bowen's purchase of certain used logging equipment, consisting of a skidder and a loader, from Jeffcoat Equipment, Inc., in Dothan. He executed a security agreement which was subsequently assigned to Commercial Credit Equipment Corporation in Montgomery. The $26,572.50 purchase price included a one-time premium of $765.00 for property damage insurance in the amount of $25,000.00 for one year's coverage beginning September 13, 1976. The premium was paid to Lomax Johnson Insurance Agency in Dothan which placed the coverage with National. The policy contained a standard loss payable clause naming Commercial Credit as mortgagee.
In late November 1976, Bowen informed the agency that his skidder had been stolen and discovered under water in a creek. When notice of this claim was received by National, it was assigned by Rufus D. Johnson, National's assistant vice-president for claims (who had authority to approve or disapprove them) to Murray McCall, an independent adjustor in Geneva, for the purpose of appraisal of the damage and adjustment. In due course the skidder was repaired by Jeffcoat Equipment, Inc., and National paid Jeffcoat $5,389.64, the full amount of the claimed loss.
On or about April 12, 1977, Bowen informed the Lomax Johnson Agency of another loss, not only to the skidder but also to the loader. He stated that he had left the equipment in the woods overnight and it had burned. Bowen stated that he was not sure of the cause. This information was telephoned to Rufus D. Johnson who contacted Murray McCall, requesting him to investigate the loss. McCall was unable to do so; therefore, Johnson telephoned Gene Bosché, president of Beneficial Investigative Services, Snellville, Georgia. Johnson had received correspondence from Bosché describing the latter's adjusting and investigative organization, together with a description of the experience of his staff. Bosché was asked to determine whether the fire was arson and, if so, to determine the identity of the arsonist. Johnson followed up this conversation with a confirming letter which included copies of the policy and the loss notice. Neither Johnson nor anyone else in National's office participated in the investigation, Johnson's instructions being, as shown by his letter to Bosché:
 "It is my understanding that your investigator will call me before he leaves the area or concludes his investigation so that we can have an opportunity to discuss his file material and determine if any further investigation is merited."
Bosché and his vice-president, Ed Pierson, went to Covington County and conducted an investigation. Their report was made in the latter part of May 1977 and included Bowen's statement of loss, in which he asserted that the actual cash value of the equipment was $60,000.00 and claimed $25,000.00 under the policy; a sketch map positioning the vehicles; photographs; and the investigator's statement describing his interviews with Bowen, with a representative of Commercial Credit Equipment Company in Montgomery, with a sheriff's department investigator, and with Ronnie Worrell and Louis "Frog" Williamson. The investigator's conclusion was that the case was one of arson committed by Bowen.
On July 26, 1977, National paid Commercial Credit $18,995.59, the amount of the unpaid balance due them under their security agreement, but did not pay Bowen the difference between the amount of their insurance policy, $25,000.00, and the $18,995.59 because, according to Rufus D. Johnson, on the basis of the investigative report, there was evidence, which he believed, that Bowen had burned the equipment.
Meanwhile, in June 1977, Bowen had been indicted by the grand jury of Covington *Page 182 
County for the offenses of arson in the third degree and false pretenses. His trial in December 1977 resulted in a mistrial, and the charges were nol-prossed in March 1978.
This action was filed on June 16, 1978. Bowen's complaint contained counts for malicious prosecution; "intentional and malicious harrassment" (outrageous conduct); willful failure to pay and fraud; and conspiracy. By amendment Bowen struck his original ad damnum demand and substituted a demand for "Two Million Five Hundred Thousand ($2,500,000.00) Dollars" in each of his Claims One, Two and Three. Claim Four was dismissed. Trial ensued against National as the only defendant on May 25, 1981. National moved for a directed verdict separately as to each claim. Ultimately a jury returned a verdict for $250,000.00 on which judgment was entered. National then moved for judgment NOV, or a new trial, both of which were denied. This appeal followed from the final judgment and the denial of the defendant's post-trial motions.
Issues I and III posed to us by the defendant, National, deal with Claim Three of the complaint. The pertinent portions of that claim follow:
 "3. The substance of the agreement, to-wit, heretofore mentioned policy of insurance, is as follows: Defendants, National Security, agreed to pay the plaintiff and/or his mortgagee under loss payable clause as such mortgagees' interest appears, in exchange for payment of premiums for a loss incurred by fire to plaintiff's equipment and machinery.
 "4. The plaintiff alleges that although he has complied with all the provisions of said agreement on his part, defendants, National Security, have willfully or wantonly failed to pay the plaintiff's loss incurred by reason of a fire which occurred on or about, to-wit, April 12, 1977, during the term of said policy and while the same was in full force and effect; notice of which was given to said defendant corporations on or about May 2, 1977. [Emphasis added.]
 "5. Plaintiff further alleges that said defendants, National Security, fraudulently and falsely represented to plaintiff that valid claims under the above mentioned policy would be paid, knowing that such statements were false; that said defendants, National Security, issued said policy and accepted premiums therefor, with the present intent not to honor valid claims thereunder.
 "6. Plaintiff adopts the allegations of Paragraphs 1, 2, 3, 4 and 5 and assigns the same to defendants 1, 2 and 3, being those persons, firms, partnerships, or other legal entities responsible for the fraudulent misrepresentations made to the plaintiff, whose true names are otherwise unknown to the plaintiff but whose true names will be substituted by amendment when ascertained by the plaintiff."
National contends that the trial court erroneously construed these allegations as stating a cause of action against it based upon its "bad faith refusal to pay a direct claim." National maintains that the allegations of Claim Three fall within and state a cause of action for "fraudulent inducement" under OldSouthern Life Ins. Co. v. Woodall, 295 Ala. 235, 326 So.2d 726
(1976). See also Old Southern Life Ins. Co. v. Woodall, Ala.,348 So.2d 1377 (1977). The defendant objected to the plaintiff's reference in his opening statement to Claim Three as a "claim of tort of bad faith," and contended then and now that "bad faith" was not in issue. Thus, argues the defendant, it was reversible error for the trial court not to grant its motion for a directed verdict specifically directed to Claim Three and for the trial court's giving three jury charges pertaining to the tort of bad faith refusal.
We have carefully compared the allegation of Claim Three with those in each of the Woodall decisions, and we agree with the defendant that they are strikingly similar, extremely so. The question, however, is whether those allegations would give notice of a bad faith claim. While it would have been preferable for plaintiff to initially have stated a "bad faith" claim with at least the same particularity as his "fraudulent *Page 183 
misrepresentation" claim, nevertheless, because that issue has been tried, in the interest of liberality in pleading, his failure to do so was not fatal in this case. Rule 8, Alabama Rules of Civil Procedure; Rule 9 (b), ibid. The plaintiff's allegations of a willful or wanton failure to pay after he had fully complied with the contractual provisions, and of the false representations that valid claims would be paid knowing that such statements were false, were sufficient under notice pleading to apprise defendant that evidence of the bad faith theory might be introduced. As stated in 5 Wright Miller, Federal Practice and Procedure, § 1216 at 121-123:
 "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested or intended by the pleader, or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial. . . ."
Indeed, an intentional failure to pay a valid claim might result from misrepresentations knowingly made that valid claims would be paid in the future. Certainly, therefore, such allegations as those we have referred to would be sufficient upon which to introduce proof of the elements of the tort of bad faith refusal.
The defendant's attack upon the merits of that claim, however, is well taken.
An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. Chavers v. National SecurityFire Ins. Co., Ala., 405 So.2d 1 (1981). No lawful basis "means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." Gulf Atlantic Life Ins. Co. v.Barnes, Ala., 405 So.2d 916 (1981). When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. Ibid.
Under those authorities the plaintiff in a "bad faith refusal" case has the burden of proving:
(a) an insurance contract between the parties and a breach thereof by the defendant;
(b) an intentional refusal to pay the insured's claim;
(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.
The "debatable reason" under (c) above means an arguable reason, one that is open to dispute or question. Webster's Third New International Dictionary (1931) at 116. See Chavers
at 10; see also Embry, J., concurring on rehearing in Aspinwallv. Gowens, Ala., 405 So.2d 134 (1981).
Applied to this case these principles cause us to inquire into the evidence establishing the reasons which prompted Rufus D. Johnson to recommend not paying Bowen the balance due under the policy. In exploring those reasons we must consider the information before Johnson at the time he made the decision not to pay Bowen.
The record shows that when Johnson was first informed of the fire loss by Grace Peacock of the Lomax Johnson Agency in Dothan "she felt that it was a loss that might need some looking into." When he learned that Murray McCall would not handle the investigation, he called Beneficial Investigative Services. He testified that he had just received a letter and resume from them announcing the formation of their *Page 184 
company. He added: "[T]he background of the people that they listed looked fairly impressive and I thought that they might do a good investigation on it." So he called their office and asked them to do an investigation as to the cause of the fire, to see if it was arson and "if it could be proven who the arsonist was." He wrote a confirming letter that day enclosing a copy of the loss notice and a copy of the front page of the policy. While talking with Gene Bosché he was assured by him that they were competent and experienced. The letter and description of Beneficial's services which were received by Johnson stated that Beneficial had received National's name and address from one Lindsey McGarity, Assistant Deputy Insurance Commissioner, Rating Division, State of Georgia. It was accompanied by another letter describing the qualifications of five full- and part-time investigators and soliciting National's business. During Johnson's conversation with Bosché, he inquired about licensing and was told that Bosché was licensed.
Following that initial conversation, his next contact with Beneficial occurred when either Gene Bosché or Ed Pierson came by his office in Elba. This caller informed Johnson that the sheriff's department was also investigating the matter. This Beneficial representative showed Johnson his Georgia investigator's license.
Subsequently, Johnson received the investigative report dated May 9, 1977, to which we have alluded earlier, and which was admitted into evidence in the trial below. The report described a visit to the scene of the fire in company with plaintiff who also operated a combination service station and grocery store. They proceeded to the rural area where the burned vehicles were standing in close proximity to one another. An unburned logging trailer, uninsured, was standing nearby. The investigator reported taking photographs of the scene, making sketches, and taking samples of the soil and remnants of the vehicles' tires which retained an odor of distillates. He reported that plaintiff disclaimed knowledge of the cause of the fire, that he had come to the scene the afternoon before the fire with a tank truck to refuel the vehicles and did so, after which he and his crew departed. Bowen stated that other investigators had taken samples from the area and had sent them to the State Fire Marshal's Office. The investigator also reported that Bowen had revealed to him that his house trailer had burned in January 1977 from an unknown cause while he and his wife were absent.
The report received by Johnson also described a visit to the scene of the fire by the Beneficial investigator in company with a sheriff's department investigator. It described the area as being flat and dry and having sandy soil, which had been soaked with some form of distillate. The report contained the observation that the interior of the truck was saturated with fuel and the doors closed after ignition, causing the windows and doors to explode outward. It reported the sheriff's investigator as stating that Bowen's tank truck was parked near the scene when the fire started and that a trail of fuel had been poured some 50 to 75 yards long leading to the area where the vehicles were parked.
The Beneficial investigator also reported on an interrogation of Ronnie Worrell conducted with the sheriff and his chief deputy. A synopsis of this statement was contained in the report, and it implicated Bowen and "Frog" Williamson in a scheme to collect insurance money by overheating the engine of his equipment, running it in a creek, and then reporting it stolen. Also reported was a statement taken by the chief deputy sheriff and the insurance investigator from "Frog" Williamson, one of Bowen's employees. Williamson gave a statement naming Bowen as the arsonist responsible for the burning of the equipment on April 12, 1977. Both the Worrell and the Williamson statements were submitted to Johnson with the report.
The report also described a later meeting when a statement was taken from Bowen who disclaimed knowledge of enemies who would burn his equipment. An interview with a representative of Commercial Credit *Page 185 
was also included. It described Bowen's account as delinquent, and Bowen as a poor financial risk with a poor record of payment on prior loans as well.
The investigator's conclusions were reported also:
 "This is a deffinate [sic] case of ARSON. Area and equipment were saturated with distillates prior to fire. 6' X 28" Tires were totally destroyed in fire, along with all other tires, hoses, and upholstery in all vehicles. SUBJECT gambles, drinks, and has been involved with prior fires and equipment losses in 1976 and 1977. SUBJECT displayed nervousness during questioning and AGENT believes that SUBJECT destroyed his own equipment. SUBJECT was known to be behind on payments (MOTIVE), owns tank truck for re-fueling which was reported at the scene (MEANS), and was at the scene the day of the fire (OPPORTUNITY)."
Plaintiff seeks to impeach the position of National by insisting that the evidence at the trial showed that National set out to "frame" Bowen through criminal prosecution and other "forms of harrassment," thus forcing him to abandon his insurance claim. We take note of the fact that the record does show a trial of Bowen on a false pretense charge and a mistrial, followed by a nolle prosequi upon the recommendation of the district attorney, apparently because of information impeaching one of the witnesses, "Frog" Williamson. We reiterate, however, that to establish "no lawful basis" for refusing to pay a claim, the plaintiff must show that the insurer lacked any legitimate or arguable reason for not paying the claim. If his evidence fails to eliminate any arguable reason for denying payment, any fairly debatable reason on a matter of fact or a matter of law, he cannot recover under the tort of "bad faith refusal."
We cannot conclude, therefore, that plaintiff has shown any evidence eliminating any arguable reasons for Johnson's refusal to pay plaintiff's claim. Indeed, Johnson's reliance upon the report submitted to him and the concomitant circumstances surrounding it furnished him with ample debatable reason. The responsibility for setting the fire, as revealed by that report, was certainly open to question, as the paralleling official investigation itself tends to establish. It was error, therefore, for the trial court to deny the defendant's motion for a directed verdict as to Claim Three.
The case was submitted to the jury on Claims One, Two and Three. The defendant moved for a directed verdict specifically against Claim Three. In this situation
 "if a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count."
 Aspinwall v. Gowens, Ala., 405 So.2d 134 (1981) (on rehearing).
The defendant's motion for a directed verdict asserted the following grounds:
 "a. The Plaintiff has failed to prove a prima facie case.
 "b. The Plaintiff has failed to prove any facts from which the jury would be entitled to infer that these Defendants fraudulently and falsely represented to the Plaintiff that valid claims would be paid, with the present intent at the time of issuing the alleged policy and accepting premiums therefor not to honor valid claims thereunder.
 "c. The evidence establishes without contradiction that claims were paid under the alleged policy."
In considering the requirement of specificity as applied to these grounds, we take note of defendant's position that Claim Three was grounded upon Woodall, supra, fraud. We have recognized that striking resemblance while giving the allegations of *Page 186 
Claim Three a liberal interpretation on the ground that an intentional failure to pay a valid claim might be inferred in a given case from evidence of misrepresentations knowingly made that valid claims would be paid in the future, although the usual proof of fraud might be to the contrary. See dissenting opinion of Torbert, C.J., in Aspinwall, supra. Applying that same reasoning equally on behalf of the defendant and to the plaintiff, we conclude that the defendant's motion sufficiently raised the absence of evidence of a bad faith claim under item (b). Ground (c) accords with this Court's view later expressed in the case of Sexton v. Liberty National Life Ins. Co., Ala.,405 So.2d 18 (1981), where payment under the policy took away the issue of bad faith refusal to pay. Together, grounds (b) and (c) were sufficient in questioning the absence of a refusal based upon bad faith, i.e., a dishonest purpose.
Because the case must be reversed for the reasons we have stated, it is unnecessary to address other issues raised by the defendant. For the error refusing the directed verdict as to Count Three, the judgment must be, and is, reversed and the cause is remanded with instructions to enter a judgment for the defendant on Count Three and to grant defendant a new trial.
REVERSED AND REMANDED WITH DIRECTIONS.
FAULKNER, JONES, SHORES, EMBRY and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX and ALMON, JJ., concur in result.
 ON APPLICATION FOR REHEARING