491 So.2d 880 (1986)
INSURANCE COMPANY OF NORTH AMERICA
v.
CITIZENSBANK OF THOMASVILLE
83-1416.
Supreme Court of Alabama.
April 25, 1986.
Rehearing Denied June 13, 1986.
Robert L. Williams and Robert D. Norman of Norman, Fitzpatrick & Wood, Birmingham, for appellant.
Richard T. Dorman and James H. Frost of Johnstone, Adams, Howard, Bailey & Gorman, Mobile, and Wyman O. Gilmore, Grove Hill, for appellee.
*881 TORBERT, Chief Justice.
This is an appeal by the Insurance Company of North America ("INA") from a judgment in favor of Citizensbank of Thomasville based on a jury verdict finding a bad faith refusal to pay an insurance claim.
Prior to Citizensbank's opening in August 1975, it obtained a banker's blanket bond from INA. The bond included fidelity coverage for fraudulent or dishonest acts of the officers and employees of the Bank. On June 9, 1977, an amendatory rider was added which defined "dishonest or fraudulent acts" to mean acts committed by an employee with the manifest intent to cause the insured to sustain a loss and to obtain financial benefit for the employee or another intended person.
This case stems from the actions of Thomas Branch, the president and chief executive officer of Citizensbank from its opening until June of 1978. Branch was replaced on June 15, 1978, by Eldon Scott, who thereafter filed, on behalf of the Bank, nine proof of loss forms with INA claiming that losses suffered by Citizensbank were the result of fraudulent and dishonest acts by Thomas Branch. These alleged acts included embezzlement of insurance commissions, making fraudulent loans, inside dealing, fraudulent nondisclosure, and submission of intentionally misleading documents. Branch subsequently pleaded guilty to charges of embezzlement and was convicted and put on probation under a suspended sentence in both state court and federal court proceedings.
A brief synopsis of the losses claimed by Citizensbank is as follows:
A. Green GroupLoans to GBW Industries, Inc., a corporation owned by the Green brothers, resulted in a $108,171.45 claimed loss, and in addition, overdrafts in the amount of $46,870.30 from January 5, 1978, to May 4, 1978, and overdrafts in the amount of $48,127.67 from May 5, 1978, to June 3, 1978. GBW Industries, Inc., filed for bankruptcy on May 5, 1978.
B. Ott GroupA loan guaranteed by the Small Business Administration resulted in a claimed loss of $93,662.57, and other loans to the Ott family resulted in claimed losses of $113,811.73. Branch was indicted and convicted of a crime in regard to the S.B.A. loan.
C. Automobile LoansRichard Hall and Billy Strickland, directors of Citizensbank, each owned an automobile dealership and each had an agreement with the Bank to finance the automobiles for his customers. The Bank claimed a loss of $77,231.42 on the Hall loans and $30,990.26 on the Strickland loans.
D. Direct Claims Against Tom Branch,The Bank claimed Branch embezzled $4,134.51, representing commissions on credit life insurance sold by the Bank. Branch was indicted for this embezzlement, pleaded guilty, and was placed on probation. Also, a loan made to Branch, in violation of Code 1975, §§ 5-6-25, -26, -29 (repealed), resulted in a claimed loss of $6,373.29.
INA never formally denied any of the claims, but Citizensbank filed this lawsuit on February 5, 1981, to avoid a 24-month contractual bar for bringing suit on the bond, and claimed a "de facto denial." The complaint asked for $606,000 on the contract claim and $2,000,000 on the bad faith claim.
At trial, Citizensbank was able to introduce evidence of only $454,658.34 of contract claim losses. On June 15, 1984, a jury awarded Citizensbank $290,431.77 on the breach of contract count and $866,930.01 on the bad faith count. INA's motion for JNOV or, in the alternative, a new trial was subsequently denied. INA paid the amount of the breach of contract judgment but initiated this appeal from the judgment against it for bad faith and the denial of its motion for JNOV or a new trial.
To recover under a theory of bad faith in Alabama, a plaintiff has a "heavy burden" to prove each element of bad faith. National Savings Life Ins. Co. v. Dutton, 419 *882 So.2d 1357, 1361 (Ala.1982). The elements which must be proved are as follows:
"`(a) an insurance contract between the parties and a breach thereof by the defendant;
"`(b) an intentional refusal to pay the insured's claim;
"`(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"`(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"`(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.'"
Mueller v. Hartford Ins. Co. of Alabama, 475 So.2d 554, 556 (Ala.1985), quoting National Security Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982); Dutton, 419 So.2d at 1361.
The test in Alabama for a finding of bad faith is recognized as a "two-tier" test. The first tier of the test "establishes that the tort of bad faith refusal to honor a direct claim arises when there exists no lawful basis for the refusal coupled with actual knowledge of that fact." Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981).
The second tier of the test involves an "intentional failure to determine whether or not there was any lawful basis for refusal," or, in other words, "whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review." Barnes, supra.
In the case at bar, both tiers of the two-tier test are being forcefully argued. The appellant, INA, argues that the first tier of the test is not met because the jury only awarded a portion of the contract claim, and therefore that a lawful basis, or at least a debatable reason, must have existed for the refusal of the entire amount being claimed. Furthermore, INA argues that the claims were properly investigated, INA having hired a CPA to perform the investigation and the investigation having entailed over 400 hours of work and the compilation of a 17-volume report.
On the other hand, the appellee, Citizensbank, argues that INA never had a lawful basis for refusing the claims, and that the fact that Thomas Branch was indicted and was found guilty in regard to two of the claims clearly shows the absence of a lawful basis for refusal. Furthermore, Citizensbank argues that the investigation by INA was inadequate and was merely preparation for trial, and that the investigation was designed solely to support its own position. See, Barnes, supra.

I
The evidence in this case shows that the insurance claims filed by Citizensbank were based on a number of banking transactions. The record indicates that these transactions were financially complex and involved a large number of parties and bank documents. Moreover, the transactions were the products of approximately three years of a bank's continuous daily business operations.
The evidence shows that Citizensbank first gave notice of possible losses to INA on September 9, 1978. The actual date of discovery of all of these losses was stipulated to be February 6, 1979. At that time, Citizensbank began its process of evaluating its own losses and preparing proofs of loss to be filed with INA. On April 11, 1979, Citizensbank filed its first proofs of loss with INA, along with notice that more proofs would be forthcoming. Approximately eight months later, on December 5, 1979, Citizensbank filed its final proofs of loss with INA, along with a supplement to its first filings.
The next 14 months were spent by INA in its investigation and evaluation of the claims filed by Citizensbank. Testimony indicated that INA was in the process of preparing a response to these claims when this lawsuit was filed on February 5, 1981, *883 and a constructive denial was alleged by Citizensbank.
In Dutton, supra, we attempted to set forth a workable test for the tort of bad faith refusal to pay. There, we stated:
"In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."
Dutton, 419 So.2d at 1362. However, because the decision of the insurance company to deny a claim under an insurance policy must be judged by what was before it at the time the decision was made, Federated Guaranty Life Ins. Co. v. Wilkins, 435 So.2d 10, 13 (Ala.1983); Dutton, 419 So.2d at 1362, and because many things may have happened between the time the denial was made and the time the case came to trial, the Dutton test may be restated to provide as follows: In the ordinary case, in order for the plaintiff to recover on a bad faith claim, the plaintiff must show that if the contract claim had been tried on the date of the denial, the plaintiff would have been entitled to a directed verdict; i.e., information received by the insurer after the date of the denial is irrelevant to the determination of whether the insurer denied at that date in bad faith. Although no express denial was ever made by INA in this case, we will consider that a constructive denial occurred at the end of the 24-month limitation set in the terms of the bond for filing suit to recover under the bond. Therefore, we must examine what was before INA at the time of the constructive denial.
On the date of the constructive denial, INA had in its possession the results of an extensive investigation into these claims by Virgil Sandifer. Sandifer's testimony indicated that he is a well qualified specialist in the area of bank audits, fraud investigations, and insurance claim investigations. He is licensed both as a C.P.A. and as an attorney.
Sandifer's investigation for INA in this case lasted 10 weeks and consumed over 400 hours of work. A 17-volume report was prepared by Sandifer and was submitted to INA on October 16, 1980. Testimony revealed that INA paid approximately $18,000 for this investigation.
The investigation report included a recommendation by Sandifer that the claims not be immediately paid. INA also contended that the claimed losses were at least partially the result of unsound business judgment; if they were, they would probably not be payable under the bond. For instance, the proof of loss on the Ott group stated that the loss was the result of "fraudulent and financially unsound business practices."
Also, the investigation showed that the Bank's board of directors may have had full knowledge of the loans when they were initially made, and that the board approved of them while the loans remained profitable, but then claimed fraud only when the loans became loss items for the Bank. Such knowledge of the dishonest or fraudulent character of the loans would have activated Section 10 of the bond, which would terminate coverage as to those particular loans. This was substantiated by a sworn petition filed by Citizensbank's successor president, Eldon Scott, in the GBW Industries, Inc., bankruptcy proceeding that stated that the Bank knowingly advanced funds to GBW in an effort to maintain GBW's ability to pay its operating expenses. Also, the report issued by Sandifer to INA included various records of board discussions about the loans, which are now being claimed to be entirely the product of fraud and dishonesty by Mr. Branch.
Furthermore, the bond covered losses incurred through "dishonest or fraudulent acts of an Employee." An amendatory rider defined "dishonest or fraudulent acts" *884 so as to require "manifest intent" of the employee to cause the Bank a loss and to obtain financial benefit for the employee or another intended person.
The findings of Sandifer, and the recommendation that INA had at the time of the constructive denial, are reflected in the following portion of Sandifer's testimony at trial:
"Q. From your investigation and study of the documentation and the bank records and the statements of witnesses and things you have done in this case which you have described to the jury, can you tell us if you found anything of a fraudulent or dishonest nature on the part of Mr. Tom Branch?
"....
"A. No, sir.
"Q. From your investigation and study of the documentation and the bank records and the statements of witnesses that have been described, do you find anything that indicated Tom Branch had received any financial benefit from any of the transactions we have talked about here?
"A. No, sir."
The "manifest intent" of Mr. Branch was not easily determinable and was debatable in this case.
A close examination of the record reveals that the majority of the monetary amounts of the claimed losses on the proof of loss forms were significantly different from the amounts claimed at trial. Some of the previously claimed losses were not even claimed at trial because they were concededly not covered under the bond. Other amounts were different because of ongoing mitigation attempts by Citizensbank. Whatever the reason, it is clear that the total amount of the losses being claimed was constantly changing throughout the time between the original filing of the claims and the constructive denial.
For example, of the nine items listed on the proof of loss for the Ott group loans, six of these amounts claimed were different, and the other three amounts were totally withdrawn. The proof of loss form regarding the Strickland automobile loans included approximately 141 separate loans for a total claimed loss of $30,990.26. At trial, $64,414 was claimed on these loans. The proof of loss form regarding the Hall automobile loans claimed a loss of $77,231.42, but only $9,340 was claimed at trial. Immediate payment by INA of these speculative amounts submitted could have resulted in an excessive recovery by Citizensbank.
Although the result of the litigation of the contract claim is not a conclusive factor, Safeco Ins. Co. v. Sims, 435 So.2d 1219, 1223 (Ala.1983), the discrepancies between the proofs of loss and the evidence at trial are noteworthy in this case, because they support INA's contention that it had good reason to question the validity of the claims.
We are of the opinion that Citizensbank was not entitled to a directed verdict on the contract claim, because there was conflicting information on most, if not all, of the individual claims. Thus, there was a genuine dispute about the validity of the claims, and that dispute provided a debatable reason for denying coverage. When a claim is debatable, an insurance company is entitled to debate it. Barnes, 405 So.2d at 924. We believe that in this case, INA was entitled to debate the claim and perhaps was obligated to its stockholders to do so. Looking at the decision in retrospect, if INA had not debated the claims but rather had paid them in full to avoid a possible bad faith action, it would have improperly paid more than $300,000 of corporate funds to Citizensbank.
The dissent to this opinion argues that the claims of Citizensbank should be separated into two categories. However, this approach is not supported by the record or by the briefs of the parties. We have carefully examined the lengthy record in order to determine if the claims could be separated into categories by this Court. We were unable to find any indication that a separation of claims occurred at any point in the development of this case.
*885 For example, the record is very inconclusive on the dates that the claim forms were filed with INA. The forms themselves are not dated, except for a notary's date at the end of each form. These notary dates indicate that proof of loss forms were probably filed on three separate dates during 1979. Testimony elicited at trial as to the filing dates is also very inconclusive. Furthermore, the claim form which was apparently filed first was materially supplemented by a proof of loss form filed with the last claim forms. Branch's indictments and convictions do not operate to separate the claims, because he was indicted and convicted in regard to a loss which was claimed in the first proof of loss filed, and was also indicted and convicted in regard to a loss which was claimed in the last claim forms filed.
All of the claimed losses were the result of only one source, i.e., the dishonest activities of Thomas Branch. It was stipulated that the claims were all discovered by Citizensbank on the same day. The plaintiff elected to include all of the claims together in only one count of the complaint. At trial, all of the claim forms were introduced as only one exhibit, and the claims were never considered in categories during the course of the trial. The plaintiff did not seek a directed verdict on any individual claims, and when the defendant asked for a directed verdict at the close of the plaintiff's evidence, the attorney for INA referred to the claims as "a single claim." This characterization was never contradicted. The jury instructions at the close of the trial did not suggest any separation of the claims into categories. The fact that the jury rendered one general verdict indicates that the jury considered all the claims as a unit. One can only speculate as to which claims the jury found should have been paid, because there was no indication of which contract claims the jury's contract award was based on.
We believe that this Court should decide this case in the posture in which it was presented to us. The parties did not try this lawsuit on the basis of categories of claims, and this Court will not completely revise the posture of this case on appeal. If the record in this case revealed that the claims arose from separate causes which were discovered at separate times, and that the claims had been filed separately and then pleaded separately, then this Court might have found a bad faith failure to pay as to individual claims. However, these are not the facts of the present case. Therefore, we have considered the issue of bad faith as it applies to one single set of claims and not to each individual claim.

II
Citizensbank alleges that INA intentionally failed to determine whether there was a legitimate or arguable reason to refuse to pay Citizensbank's claims. Because we find that INA had a debatable reason for denying the claims, it is irrelevant whether INA conducted a proper investigation. Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala.1981).
For the foregoing reasons, we conclude that the trial judge erred in submitting the bad faith count to the jury, and the defendant's motion for a directed verdict on this count should have been granted. We, therefore, reverse and remand.
REVERSED AND REMANDED.
MADDOX, ALMON, SHORES, BEATTY and HOUSTON, JJ., concur.
JONES and ADAMS, JJ., concur in part and dissent in part, with opinion by JONES, J.
JONES, Justice (concurring in part and dissenting in part):
When I first read the opinion which has now been adopted as the opinion of the Court, I thought the writer, through inadvertence, had omitted any discussion of "D. Direct Claims Against Tom Branch." It was clear from the opinion that these "direct claims" arose out of Branch's criminal conduct and that they were "direct" in the sense that Branch personally and fraudulently obtained the Bank's moneylosses insured against under Insurance Company *886 of North America's (INA's) bond as "fraudulent acts." Yet, the opinion addressed only those claims designated as "A," "B," and "C"losses insured against under INA's bond as "dishonest acts."
I found myself in complete agreement with the proposed opinion's analysis and conclusion with respect to those claims based upon Branch's "dishonest" acts. But the opinion proposed to reverse the trial court (and, in effect, render judgment in the cause) for not directing a verdict as to the Bank's entire bad faith claim.
In my naivete (I now learn) I thought that, if the record bore out the Bank's contention that INA offered no defense to the Bank's bad faith theory based on its "direct" claims against Branch, an extension of the originally proposed opinion, affirming in part and reversing in part would be accepted unanimously as the opinion of the Court. I now know that our differences are based on more than a mere disagreement over the posture of the record, and that the failure of the proposed opinion to address those fraud claims against which INA had no defense was a conscious (and, I must add,) successful attempt to weaken the already circumscribed cause of action for bad faith.
I prepared for the Court's consideration a proposed opinion dealing with the case as I thought it should be dealt with. (That proposed opinion's statement of the facts, in large measure, is identical to what now appears as the majority opinion.) I lost. I now set out that rejected opinion as a full expression of my views on the issues here presented:
"This is an appeal by the Insurance Company of North America (`INA') from a judgment in favor of Citizensbank of Thomasville based on a jury's verdict finding bad faith refusal to pay an insurance claim.
"Prior to the Bank's opening in August 1975, it obtained a banker's blanket bond from INA. The bond included fidelity coverage for fraudulent or dishonest acts of the officers and employees of the Bank. On June 9, 1977, an amendatory rider was added which defined `dishonest or fraudulent acts' to mean `acts committed by an employee with the manifest intent to cause the insured to sustain a loss and to obtain financial benefit for the employee or another intended person.'
"This case stems from the actions of Thomas Branch, the Bank's president and chief executive officer from its opening until June of 1978. Branch was replaced on June 15, 1978, by Eldon Scott, who thereafter filed, on behalf of the Bank, two independent sets of proof of loss forms with INA, claiming that losses suffered by the Bank were the result of fraudulent and dishonest acts by Branch. These alleged acts included embezzlement of insurance commissions, making fraudulent loans, inside dealing, fraudulent nondisclosure, and submission of intentionally misleading documents. Branch subsequently pleaded guilty to, and was convicted of, charges of embezzlement and fraud.
"A brief synopsis of the two classifications of losses claimed by the Bank is as follows:

"Category I ClaimsFiled April 11, 1979.
"Direct Claims Against Tom Branch The Bank claimed Branch: (1) embezzled $4,134.51, representing commissions on credit life insurance sold by the Bank; and (2) defrauded the Bank by means of a personal loan for $6,373.29, in violation of Code 1975, §§ 5-6-25, -26, -29 (repealed). Branch was indicted for these offenses, pleaded guilty, and was convicted and sentenced.

"Category II ClaimsFiled December 5, 1979.
"A. Green GroupLoans to GBW Industries, Inc., a corporation owned by the Green brothers, resulted in a $108,171.45 claimed loss, and in addition, overdrafts in the amount of $46,870.30 from January 5, 1978, to May 4, 1978, and overdrafts in the amount of $48,127.67 from May 5, 1978, to June 3, 1978. GBW Industries, Inc., filed for bankruptcy on May 5, 1978.
*887 "B. Ott GroupA loan guaranteed by the Small Business Administration resulted in a claimed loss of $93,662.57, and other loans to the Ott family resulted in claimed losses of $113,811.73.
"C. Automobile LoansRichard Hall and Billy Strickland, directors of Citizensbank, each owned an automobile dealership and each had an agreement with the Bank to finance the automobiles for his customers. The Bank claimed a loss of $77,231.42 on the Hall loans and $30,990.26 on the Strickland loans.
"INA never formally denied any of the claims, but the Bank filed this lawsuit on February 5, 1981, to avoid a 24-month contractual bar for bringing suit on the bond, and claimed a `de facto' denial. The complaint asked for $606,000 on the contract claim and $2,000,000 on the bad faith claim.
"At trial, the Bank introduced evidence of only $454,658.34 of contract claim losses. On June 15, 1984, a jury awarded the Bank $290,431.77 on the breach of contract count and $866,930.01 on the bad faith count. INA's motion for JNOV, or in the alternative for a new trial, was subsequently denied. INA paid the amount of the breach of contract judgment but initiated this appeal from the judgment against it for bad faith and the denial of its motion for JNOV or a new trial.
"To recover under a theory of bad faith in Alabama, a plaintiff has a "heavy burden" to prove each element of bad faith. National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1361 (Ala.1982). The elements which must be proved are as follows:
"`"(a) an insurance contract between the parties and a breach thereof by the defendant;
"`"(b) an intentional refusal to pay the insured's claim;
"`"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"`"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"`"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.'"
Mueller v. Hartford Ins. Co. of Alabama, 475 So.2d 554, 556 (Ala.1985), quoting National Security Fire and Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982); Dutton, 419 So.2d at 1361.
"The test in Alabama for a finding of bad faith is recognized as a `two-tier' test. The first tier of the test `establishes that the tort of bad faith refusal to honor a direct claim arises when there exists no lawful basis for the refusal coupled with actual knowledge of that fact.' Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981).
"The second tier of the test involves an `intentional failure to determine whether or not there was any lawful basis for refusal,' or, in other words, `whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review.' Barnes, supra.
"In the case at bar, both tiers of the two-tier test are being forcefully argued. INA argues that the first tier of the test is not met because the jury awarded only a portion of the contract claim, and therefore that a debatable reason must have existed for the refusal of the entire amount being claimed. Furthermore, INA argues that the claims were properly investigated, INA having hired a C.P.A. to perform the investigation and the investigation having entailed over 400 hours of work and the compilation of a 17-volume report.
"On the other hand, the Bank argues that INA never had a lawful basis for refusing the claims. Specifically, the Bank points out that Branch was indicted on, and pleaded guilty to, charges of embezzlement based on the April 11, 1979, claims. Furthermore, the Bank argues that the investigation by INA was inadequate and was merely preparation for trial, and that the *888 investigation was designed solely to support its own position. See Barnes, supra.
"As we have previously indicated, our careful review of a nine-volume record discloses that the contract losses claimed by the bank fall into two distinct categories: (1) the direct claims against Branch; and (2) the loans to the Green Group, the Ott Group, and to the automobile dealers, Richard Hall and Billy Strickland. For definitional purposes, the distinction between these two groups is borne out by the testimony of Lamar Street, the INA agent who supervised the handling of these claims. In response to a question in which he was asked to define the term `dishonest or fraudulent acts,' as used in INA's bond, he quoted from the insurer's manual:
"`Dishonesty within such a contract may be something short of criminality [citing cases]. The appeal is to the mores rather than to the statutes. Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of man.
"`....
"`The word "dishonest," when used in fidelity bonds, has been interpreted in many cases. It has been held that it is to be given a broad meaning and this includes an act manifestly unfair to the employer and palpably subjects him to the likelihood of a loss, one which indicates a reckless, willful, and wrong disregard for the interest of the employer, and wrongful acts which, although not criminal, nevertheless display significant lack of probity, integrity, or trustworthiness.'
"We recognize that our division of the Bank's claims into two categories is a partial rejection of the respective positions of each of the parties. On the one hand, the primary thrust of INA's defense to the Bank's bad faith claim, both during trial and on appeal, is its assertion of reasonably debatable grounds for denying the second category of claims. On the other hand, the Bank emphasizes, first at trial and again here, those Category I losses resulting from Branch's fraudulent conduct for which he was indicted and convicted, as the basis for its bad faith claim.
"This is not to say that INA failed to insist on a legal basis for denial of each of the Bank's claims, including those based on Branch's criminal conduct. Nor is it accurate to say that the Bank did not urge that each aspect of its contract claims forms a basis for its bad faith claim. But the fact remains that each party's strongest position consists of its opponent's weakest position. We find that the record validates the positions most strongly emphasized by the respective parties. Indeed, as the two separate holdings of this opinion reveal, INA is entitled to a reversal of the judgment with respect to those subjective losses included in Category IIits strongest position; and upon remand of this cause, the Bank is entitled to a new trial upon its bad faith claim based upon those objective losses included in Category Iits strongest position.[1]

*889 "Category I Claims
"The evidence pertaining to each of the Bank's separate categories of losses paints two entirely different pictures. The highly subjective nature of those claims for which INA has demonstrated a fairly debatable reason for denying payment, as discussed later, is in sharp contrast to those more definitive, objective losses resulting from Branch's direct and intentional misappropriation of bank funds. As noted earlier, the Bank's proof of loss filed on April 11, 1979, consists exclusively of the claimed losses due to Branch's embezzlement of funds. This proof of loss form lists three separate claims: Protective Life Insurance Company additional annual commission for 1975 ($428.93); Protective Life Insurance Company additional annual commission for 1976 ($3,705.58); and the May 11, 1978, loan ($6,700.00). Additionally, this proof of loss form reflected a credit of $300.81 as payments received by the bank, thus reducing the original claim from $6,700.00 to a net of $6,399.19, for a sum total of $10,533.70.
"Contrary to the Category II losses, these Category I losses did not vary in substance or amount from the April 11, 1979, date of filing to the conclusion of Plaintiff's evidence on the trial of the case. Unlike the Category II losses, these direct claims did not involve complex financial arrangements or a multiplicity of documents reflecting the transactions made the basis of the claims.
"Rather, Branch diverted a substantial amount of life insurance commissions from Bank income to his personal use and effected a personal loan from the Bank on terms and conditions proscribed by banking regulations, with full knowledge of the wrongfulness of his conduct. He was charged in three separate indictments on multiple counts of embezzlement. The only supplements to this single proof of loss filing consists of photocopies of court records reflecting the criminal indictments, Branch's pleas of guilty, and the sentences pronounced by the court. To this proof of loss, as thus supplemented, INA made no response.
"INA's evidence during trial in response to the claims for loss of life insurance commissions was to the general effect that some portion of the commission was paid to the Bank as income; but this evidence does not rise to the level of a defense to that portion of the commission which he diverted to his own use (which, in fact, is the only portion included in the Bank's proof of loss). INA's evidence in response to the embezzlement claim, growing out of Branch's personal loan, is to the effect that the Bank's board of directors approved the loan. But, here again, this evidence falls woefully short of a legal defense because it tells only part of the story. In fact, the loan in question was made subject to a rate of interest appreciably lower than the prime rate and its repayment was extended over a period of more than 11 years, all in violation of banking regulations and the terms approved by the Bank's board of directors.
"Just as we are convinced that the Bank's claims for Category II losses were subject to INA's directed verdict motion on the Bank's bad faith claim, we are also convinced that the Bank was entitled to a directed verdict on its contract claim with respect to Category I losses. Indeed, the jury verdict on the contract claim, which did not include a substantial amount of the Bank's Category II losses as claimed, neccessarily included the full amount of its Category I losses.
"Lest our reference to the criminal charges be misunderstood, we hasten to say that we agree with INA's contention that Branch's pleas of guilty, of themselves, do not render INA liable under its Bond as a matter of law. Our determination of `no debatable reason,' with respect to the Bank's embezzlement claims, is based upon our review of the totality of the evidence of record.

"Category II Claims
"The evidence of record shows that the Category II claims filed by the Bank were *890 based on a number of separate banking transactions. These transactions were financially complex and involved a large number of parties and bank documents. Moreover, the transactions were the products of approximately three years of the bank's continuous daily business operations.
"The time frame within which the separate proof of loss forms were filed and INA's treatment of each are helpful in our analysis of the Category II claims. The Bank first gave notice of possible losses to INA on September 9, 1978. At that time, the Bank began its process of evaluating its own losses and preparing proofs of loss to be filed with INA. On April 11, 1979, the Bank filed its first proofs of loss with INA, along with notice that more proofs would be forthcoming. Approximately eight months later, on December 5, 1979, the Bank filed its second, and final, proofs of loss with INA.[2]
"The next fourteen months were spent by INA in its investigation and evaluation of the claims filed by the Bank. According to INA, it was in the process of preparing a response to these claims when the Bank filed this lawsuit on February 5, 1981, alleging constructive denial.
"In Dutton, supra, we attempted to set forth a workable test for the tort of bad faith refusal to pay. There, we stated:
"`In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.' Dutton, 419 So.2d at 1362. However, because the decision of the insurance company to deny a claim under an insurance policy must be judged by what was before it at the time the decision was made, Federated Guaranty Life Ins. Co. v. Wilkins, 435 So.2d 10, 13 (Ala.1983); Dutton, 419 So.2d at 1362, and because many things may have happened between the time the denial was made and the time the case came to trial, the Dutton test may be restated to provide as follows: In the ordinary case, in order for the plaintiff to recover on a bad faith claim, the plaintiff must show that if the contract claim had been tried on the date of the denial, the plaintiff would have been entitled to a directed verdict; i.e., information received by the insurer after the date of the denial is irrelevant to the determination of whether the insurer denied at that date in bad faith. Although no express denial was ever made by INA in this case, we will consider that a constructive denial occurred at the end of the 24-month limitation set in the terms of the bond for filing suit to recover under the bond. Therefore, we must examine what was before INA at the time of the constructive denial.
"On the date of the constructive denial, INA had in its possession the results of an extensive investigation into these claims by Virgil Sandifer. Sandifer's testimony indicated that he is a well qualified specialist in the area of bank audits, fraud investigations, and insurance claim investigations. He is licensed both as a C.P.A. and as an attorney.
"Sandifer's investigation for INA in this case lasted ten weeks and consumed over 400 hours of work. A 17-volume report was prepared by Sandifer and was submitted to INA on October 16, 1980. Testimony revealed that INA paid approximately $18,000 for this investigation.
"The investigation report included a recommendation by Sandifer that the claims not be immediately paid. INA also contended that the claimed losses were at least partially the result of unsound business *891 judgment; if they were, they would probably not be payable under the bond. For instance, the proof of loss on the Ott group stated that the loss was the result of `fraudulent and financially unsound business practices.'
"Also, according to the investigation, the Bank's board of directors may have had full knowledge of the loans when they were initially made, and that the board approved of them while the loans remained profitable, but then claimed fraud only when the loans became loss items for the Bank. Such knowledge of the dishonest or fraudulent character of the loans would have activated section 10 of the bond, which would terminate coverage as to those particular loans. This was substantiated by a sworn petition filed by the Bank's successor president, Eldon Scott, in the GBW Industries, Inc., bankruptcy proceeding that stated that the Bank knowingly advanced funds to GBW in an effort to maintain GBW's ability to pay its operating expenses. Also, the report issued by Sandifer to INA included various records of board discussions about the loans, which are now being claimed to be entirely the product of fraud and dishonesty by Branch.
"Furthermore, the bond covered losses incurred through `dishonest or fraudulent acts of an Employee.' An amendatory rider defined `dishonest or fraudulent acts' so as to require `manifest intent' of the employee to cause the Bank a loss and `to obtain financial benefit for the employee or another intended person.'
"The findings of Sandifer, and the recommendation that INA had at the time of the constructive denial, are reflected in the following portion of Sandifer's testimony at trial:
"`Q. From your investigation and study of the documentation and the bank records and the statements of witnesses and things you have done in this case which you have described to the jury, can you tell us if you found anything of a fraudulent or dishonest nature on the part of Mr. Tom Branch?
"`....
"`A. No, sir.
"`Q. From your investigation and study of the documentation and the bank records and the statements of witnesses that have been described, do you find anything that indicated Tom Branch had received any financial benefit from any of the transactions we have talked about here?
"`A. No, sir.'[3]
The `manifest intent' of Branch, therefore, was not easily determinable and was fairly debatable as to each of the Category II losses. Indeed, contrary to Category I losses, the majority of the monetary amounts of Category II losses, as claimed on the proof of loss forms, were significantly different from the amounts claimed at trial. Some of the previously claimed losses were not even claimed at trial, because the Bank concluded that they were not covered under the bond. Other amounts were different because of ongoing mitigation attempts by the Bank. Whatever the reason, it is clear that the total amount of Category II losses claimed was constantly changing throughout the time between the original filing of the claims and the constructive denial.
"For example, for the nine items listed on the proof of loss for the Ott Group loans, six of these amounts claimed were different, and the other three amounts were totally withdrawn. The proof of loss form regarding the Strickland automobile loans' included approximately 141 separate loans for a total claimed loss of $30,990.26. At trial, $64,414 was claimed on these loans. The proof of loss form regarding the Hall automobile loans claimed a loss of $77,231.42, but only $9,340 was claimed at trial. Immediate payment by INA of these speculative amounts submitted could have resulted in an excessive recovery by the Bank.
*892 "Although the result of the litigation of the contract claim is not a conclusive factor, Safeco Ins. Co. v. Sims, 435 So.2d 1219, 1223 (Ala.1983), the discrepancies between the proofs of loss and the evidence at trial are noteworthy in this case, because they support INA's contention that it had good reason to question both the coverage and the amount of all Category II claims.
"We are of the opinion that the Bank was not entitled to a directed verdict on the entire contract claim, because the conflicting information furnished a genuine dispute about the validity of the Category II claims; and that dispute provided a fairly debatable reason for denying coverage. When a claim is debatable, an insurance company is entitled to debate it. Barnes, 405 So.2d at 924. We are clear to the conclusion that INA was entitled to debate each Category II claim, and thus was obligated to its stockholders to do so. To be sure, if INA had paid the Category II claims in full to avoid a possible bad faith action, it would have improperly paid more than $300,000 of its corporate funds to the Bank.
"INA's overt attempt to merge the two separate proofs of loss filings into a single `claim,' and thus use the weaker category of claims to impugn the validity of the stronger category, is not supported by the record. In addition to the sharp contrast in the substantive nature of the two groups of claims, the filing sequence of the two distinct categories refutes the insurer's `single entity' or `merging' concept.
"As we have previously noted, all of the Category I losses were detailed in the Bank's April 11, 1979, proof of loss filing, as supplemented by photocopies of supporting court documents. The Category II filing, containing those claims for which INA had legitimate grounds for dispute, did not occur until December 5, 1979. Moreover, the multiple filings of amendatory documents after December 5 related exclusively to the Category II losses. Although INA may have been justified in delaying its response to the April 11 filing to await the Bank's forthcoming December 5 filing, it can hardly justify its ultimate denial of the former proofs of loss, for which it offered `no debatable reason,' by its assertion of `debatable reasons' for denial of the latter proofs of loss.
"Our rejection of INA's `single entity' treatment of these separate and distinct sets of claims is not to be construed as placing the burden on an insurer to single out, for acceptance or rejection, each separate item of loss claimed by the insured, under all circumstances. To be sure, if a proof of loss form lists multiple items of loss arising out of a single incident or occurrence insured against, and there is a debatable reason for refusing to pay any item so listed, the insurer may refuse payment of the entire loss claimed without risking liability for bad faith refusal.
"For example, if an insured files a homeowner's proof of loss form listing six items damaged by fire, the law will treat each separate item as an integral part of a single claim and not burden the insurer with the duty to offer payment on five of the items if the insurer has a `debatable reason' to deny payment of one item. If, on the other hand, this same insured files a proof of loss claim for roof damage due to a windstorm occurring three months later while the fire loss claim remains unpaid, and the insurer has no debatable reason to deny the roof damage claim, the insurer cannot assert the debatable reason applicable to the fire claim and thereby escape liability for bad faith denial of the windstorm claim.
"Because of our respective holdings with regard to the two separate categories of the Bank's claims, the Bank's allegation that INA intentionally failed to determine whether there was an arguable reason to refuse payment is not a viable theory for bad faith recovery. Furthermore, the second tier of the bad faith test is not borne out by the evidence.
"For the foregoing reasons, we hold that the trial judge erred in submitting the bad faith claim to the jury with respect to each of the Bank's losses included in its December 5, 1979, proofs of loss. We further *893 hold that the trial judge did not err in his denial of INA's motion for a directed verdict with respect to each of the losses in the Bank's April 11, 1979, proofs of loss. We, therefore, affirm as to the trial court's denying of INA's motion for directed verdict on those aspects of the Bank's Category I claims; we reverse as to the trial court's denying of a directed verdict on those aspects of the Bank's Category II claims; and we remand this cause for a new trial on the Bank's bad faith claim for nonpayment for those losses contained in its April 11, 1979, proofs of loss."
After the foregoing proposed opinion was circulated for the Court's consideration, but before the opinion was released, the opinion of the Court was supplemented to answer that proposed opinion. The Court's opinion is now self-contradictory. In the early part of the opinion, the claims are separated into four classifications: "A. Green Group"; "B. Ott Group"; "C. Automobile Loans"; and "D. Direct Claims Against Tom Branch." Again, under Part I, the opinion states:
"On April 11, 1979, Citizensbank filed its first proofs of loss with INA, along with notice that more proofs would be forthcoming. Approximately eight months later, on December 5, 1979, Citizensbank filed its final proofs of loss with INA, along with a supplement to its first filings."
Not only are these initial dates accurate, and in fact undisputed, but the losses listed on the April 11, 1979, filing represent all of the "D. Direct Claims Against Tom Branch" shown under "a brief synopsis of the losses claimed by Citizensbank." Furthermore, these direct claims do not constitute any of the losses based upon Branch's mere "dishonest" conduct, but are confined to the claimed losses resulting from his criminal conduct, for which INA offered no cognizable defense.
My proposed opinion's two-category separation of the claims finds its justification in the law's application to undisputed facts. The majority opinion rejects this separation on the following grounds:
1) "All of the claimed losses were the result of only one source, i.e., the dishonest activities of Thomas Branch";
2) "the claims were all discovered by Citizensbank on the same day";
3) "plaintiff elected to include all of the claims together in only one count of the complaint";
4) "all of the claim forms were introduced as only one exhibit";
5) "plaintiff did not seek a directed verdict on any individual claims"; and
6) "when the defendant asked for a directed verdict at the close of the plaintiff's evidence, the attorney for INA referred to the claims as `a single claim.'"
How any of the above listed grounds forms a legal test for treating as a single claim these multiple losses, resulting from different incidents and covered under the bond as different risks of loss, I do not understand. No authority is cited for such a conclusion, nor did I find any. In fact, Count One of the two-count complaint claims damages for breach of contract failure to pay each of the alleged losses and Count Two claims damages for bad faith failure to pay "some or all" of these claimed losses. The evidence at trial details each alleged loss separately and severally (the only way the Bank could legally meet its burden of proof); and the briefs of the respective parties separate the claims both by proof of loss filings and by individual incidents or occasions of losses. Indeed, the opinion's "brief synopsis of the claims" is copied directly from INA's briefthe same format followed in the Bank's brief.
Furthermore, the Court's opinion reflects the appropriate separation of the claims; but then, for unexplained reasons, it elects to treat only those claims for which INA asserted a debatable reason for not paying. I find only one possible reference in the Court's opinion to the nondebatable "Direct Claims Against Tom Branch": "We are of the opinion that Citizensbank was not entitled *894 to a directed verdict on the contract claim, because there was conflicting information on most, if not all, of the individual claims."
In the final analysis then, the majority opinion and my proposed opinion are separated by only one word: Where the majority says "most, if not all, of the individual claims" (emphasis supplied), I would say "most, but not all, of the individual claims."
One parting comment: Having observed that the Bank was not entitled to a directed verdict because of conflicting information on most of the individual claims, the Court's opinion concludes that "[i]f ... the claims arose from separate causes ... discovered at separate times, ... filed separately and then pleaded separately, then this Court might have found a bad faith failure to pay as to individual claims." (Emphasis supplied.) Apparently, the majority is entirely comfortable with its finding of "individual claims" in declaring the impropriety of a directed verdict on behalf of the Bank on its contract count, while it rejects the existence of "individual claims" in testing the validity of the Bank's bad faith claim.
But maybe it is unfair for me to take the time and put forth the effort to compare the original draft with the hurriedly added paragraphs of the final opinion. After all, the original draft was never intended to draw attention to the unaddressed, nondebatable claims, while the supplemental paragraphs seek only to reply to the disagreement I expressed in my own proposed opinion.
Again, in conclusion, the reader is cautioned not to misinterpret the above quoted proposed opinion. This proposed opinion was rejected by the Court, but it is quoted here as an expression of the views of Justices Jones and Adams, concurring in part and dissenting in part.
ADAMS, J., concurs.
NOTES
[1] "We deem it appropriate to comment upon a procedural problem raised by our affirmance in part and reversal in part in the context of a single ruling by the trial court in denying Defendant's motion for a directed verdict as to the Plaintiff's bad faith claim. It is an established rule that a general verdict, based upon multiple claims submitted to the jury, is referable to any good claim where the directed verdict motion is addressed to the claims as a whole, even though some of the submitted claims are subsequently held bad. To invoke the application of this rule to the particular posture of this case, however, could work an injustice. Although INA's formal motion for a directed verdict was not addressed to the several aspects of the Bank's bad faith claim, a fair reading of the entire record of trial demonstrates that the respective parties recognized and dealt with the separate and several claims made the basis of both the Bank's contract and bad faith actions, and the more informal colloquy between counsel and the trial court, while addressing the directed verdict motion, sufficiently delineated the separate claims to offer the trial court an opportunity to address its ruling on the directed verdict motion to the separate and several aspects of the Bank's bad faith claim. Thus, to avoid a possible injustice we have resolved any doubt in favor of the movant, INA."
[2] "For the sake of clarity, we note that the April 11, 1979, proofs of loss were confined to the Category I claims, and that the December 5, 1979, proofs of loss consisted exclusively of Category II claims."
[3] "We note that the phrase `the transactions we have talked about here' refers to Category II claims only. Indeed, on cross-examination, this witness declined to give a `no' answer to a similar question relating to Branch's embezzlement of Bank funds."