When the tort of bad faith refusal to pay an insurance claim was recognized by this Court, this Court listed the following elements of a cause of action:
 "(1) an insurance contract between the parties and a breach thereof by the defendant;
 "(2) an intentional failure to pay the insured's claim;
 "(3) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
 "(4) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
 "(5) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
National Sec. Fire Cas. Co. v. Bowen, 417 So.2d 179, 183
(Ala. 1982).
Today, the majority expands the tort of bad faith refusal to pay to include claims that are being litigated in court and misstates the law concerning the survivability of tort claims. I must respectfully dissent.
Summarized, the facts are as follows:
Johnny White and his wife were injured in an automobile accident on November 4, 1983, just a little over one year after the decision in Bowen, while he was driving a company vehicle that was covered under a fleet policy along with 11 other company vehicles. As pointed out in the majority *Page 497 
opinion, Mr. and Mrs. White each accepted, on September 12, 1984, payment of the basic $10,000 coverage, but both claimed a right to stack the fleet coverage (12 vehicles were included under the policy coverage), and on October 24, 1984, they filed their initial lawsuit against Farm Bureau Insurance Company, Georgia Casualty Surety Company, and other fictitiously named defendants, and demanded "a trial by Struck Jury."
Five months later, on March 28, 1985, the Whites amended their complaint to claim that Georgia Casualty was guilty of bad faith in claiming that the Whites were not entitled to stack the fleet coverage on the uninsured motorist policies, but the trial court subsequently granted Georgia Casualty's motion for summary judgment on this fraud claim and on the contract claim. The effect of that judgment was to hold that the Whites were not entitled to stack the fleet coverage, the legal position advanced by Georgia Casualty on the motion for summary judgment. The summary judgment also dismissed the fraud claims. The court entered an order reading, in part, as follows:
 "Pursuant to the findings above, the court determines that the plaintiffs are insureds of the second class and as such were entitled to the uninsured motorist coverage previously paid to them by defendant. However, their coverage as insureds of the second class is effectively limited by the limiting clause contained in the uninsured motorist provisions of the policy here in question and, therefore, plaintiffs cannot stack coverage.
 "As authority for the aforesaid, citation of the following is in order: Section 32-7-23, Code of Alabama, 1975, as amended; Lambert v. Liberty Mutual Insurance Company, 331 So.2d 260 (Ala. 1974); Nationwide Mutual Insurance Company v. United Services Automobile Association, 359 So.2d 380 (Ala. 1978); Holloway v. Nationwide Insurance Company, 376 So.2d 690 (Ala. 1978); and Fuqua v. Travelers Insurance Company, 734 F.2d 616 (11th Cir. 1984).
 "The court further finds there is no genuine issue in this action as to any material fact and the defendant is entitled to summary judgment as a matter of law."
At the time this order was entered, Georgia Casualty had ajudicial determination that was consistent with the position it had taken, that neither of the Whites was entitled to stack. Clearly, there was no bad faith on Georgia Casualty's part in asking for a summary judgment on the question of the legal right of the Whites to stack the fleet coverage.
The order issued by the trial judge on December 19, 1985, dismissed not only the contract claim but also the fraud claims of the Whites. The Whites then appealed to this Court, and this Court, in White v. Georgia Casualty Surety Co., 520 So.2d 140
(Ala. 1988) (White I) held that Mr. White could stack, but refused to permit Mrs. White to stack the coverages. As pointed out in the majority opinion in this case, "[t]he Whites' application for rehearing [in White I] was denied on February 12, 1988, and the certificate of judgment was issued on March 1, 1988." Majority Op. at 489-490. In White I, this Court did not address the fraud claims, even though those claims had been dismissed by the summary judgment order. The majority correctly admits that "White I addressed only the 'entitlement to stack' issue, leaving uncertainty as to any appellate disposition of the two fraud claims that had been alleged in the first and second amended complaints." Op. at 490. Consequently, there was "uncertainty" as to just which claims had been decided by WhiteI, and which claims were still pending after remand. It is clear that when the certificate of judgment was issued by this Court, the case was remanded not rendered; therefore, this Court did not order the policy limits to be paid.
Even though Georgia Casualty lost its case on appeal insofar as Mr. White was concerned, it was not bad faith for Georgia Casualty to present its position on appeal.
It is undisputed now that when this Court reversed and remanded Mr. White's case, Mrs. White's claim on the contract *Page 498 
and her fraud claims were not pending, because the summary judgment as to her claims was affirmed by White I. What was pending insofar as Mr. White was concerned? The summary judgment against him had been reversed and the cause remanded; therefore, his contract claim to recover the stacked policy limits ($110,000) was definitely pending, and it was later judicially determined that one of his fraud claims was still pending.
It is uncontroverted that when Mr. White's contract claim was remanded, Georgia Casualty had previously filed an answer to the initial complaint in which it denied the allegations of Mr. White's complaint on the contract claim; therefore, Georgia Casualty, at that point, had a legal right to insist that Mr. White prove that his injuries and damages were caused by anuninsured motorist, and the record is clear that the amount of damages attributable to the accident was in dispute. The majority's finding to the contrary is not supported by the record. Also, as the majority admits, there was "uncertainty" concerning the disposition of the fraud claims, and this "uncertainty" was exacerbated by the fact that Mr. White had died while the matter was on appeal in this Court.
Furthermore, Mrs. White, in her representative capacity, made several discovery requests, "in an apparent attempt to uncover information relating to their fraud claims,"[1] but insofar as I can tell, Mrs. White did not take any action to have the trial court enter a judgment on the contract claim that was then pending. Georgia Casualty objected to the discovery request by Mrs. White, on the ground that fraud was no longer an issue in the case. The trial court denied Georgia Casualty's request for a protective order, and Georgia Casualty petitioned this Court for a writ of mandamus. See Ex parte Georgia Cas. Sur. Co.,531 So.2d 838 (Ala. 1988). In that case, this Court said, regarding the "first fraud claim" (that Georgia Casualty had misrepresented to the Whites that stacking was not allowed under the terms of the policy):
 "When this Court held that Mr. White was entitled to stack coverage and, thus, reversed the summary judgment as to him, the first fraud claim was reinstated to the extent that it related to alleged misrepresentations concerning the extent of his coverage."
531 So.2d at 841.
A close reading of White II, however, shows that its basic holding is that this Court was not convinced that the trial judge had abused his discretion in refusing to limit discovery on the fraud claim. Clearly, White II was not a mandate that Georgia Casualty pay the pending contract claim, only a holding that discovery could proceed. In fact, it appears to me that the strategy of the plaintiff when the mandate of this Court was issued in March 1988, was to try both the contract and the fraud claims before a jury, because the record shows that the plaintiff was making trial preparations and was not seeking immediate payment of the $110,000. Insofar as I can tell, the plaintiff and defendant were engaging in activities not inconsistent with trial preparations in any case that is pending in court. For example, there is evidence in the record of negotiations between the parties, encouraged by the trialcourt, to try to settle the case, including both the fraud claim and the contract claim in White I, and there is evidence that Georgia Casualty made several offers to the plaintiff in an attempt to settle the case, but that these offers were not accepted. In fact, the evidence is that plaintiff did not even respond to them, negatively or otherwise. As the majority states, it was not until this Court decided White II that "Mrs. White, as representative of Mr. White's estate, moved for summary judgment with respect to the claim for $110,000 (12 vehicles X $10,000 per vehicle, less the $10,000 previously paid to Mr. White) for uninsured motorist benefits" and took official action to get a summary judgment entered on the contract claim. Maj.Op. at 490. This motion for summary judgment was filed on September *Page 499 
30, 1988, six months after this Court's mandate in White I, and was the only official action by the plaintiffs to recover on the contract claim. For this Court to hold that, based on these facts, there was no debatable issue on the extent of the plaintiffs' damages is most regrettable.[2]
Georgia Casualty had contemporaneously filed a motion for summary judgment on the fraud claim that was still pending in which the plaintiffs claimed that Georgia Casualty had acted in bad faith by offering only $7,500 in June 1984 to settle the original uninsured motorist claim. On December 8, 1988, while these cross-motions for summary judgment were under submission, Mrs. White, in her representative capacity, sought to amend her complaint to add a claim of bad faith, in which she averred that Georgia Casualty had continued to refuse to pay the uninsured motorist claim after this Court's decision in WhiteI, the very issue that was under submission on her summary judgment motion that the court had not yet decided. On December 28, 1988, the trial court entered separate orders on the summary judgment motions of the parties, entering a summary judgment for the plaintiff on her contract claim and a summary judgment for Georgia Casualty on the fraud claim that was pending. The Court, however, did what I consider to be legally impermissible; it also permitted the amendment that plaintiff filed during the time the summary judgment motion was under submission.
When the trial court, on December 28, 1988, entered a summary judgment for the plaintiff on her contract claim, that was thefirst time the plaintiff had a court order that entitled her to the $110,000 on her contract claim initially filed by her husband.[3] The majority states that Georgia Casualty can be penalized with a $2,000,000 judgment because it did not immediately pay the $110,000 after this Court issued its mandate in White I. The Court unfortunately ignores the fact that a contract action was pending, in which plaintiff had demanded a trial by jury. If the plaintiff was entitled to a summary judgment on the contract claim when White I was decided, why did she wait six months before filing her contract claim or any evidence supporting that claim? The better question is: If there was no debatable question about liability and the extent of Mr. White's damages in October 1984, when the suit was filed, why did Mr. White not ask for a partial summaryjudgment at that time, so that the stacking issue would have been the only controverted issue in the lawsuit?
This Court, unfortunately, does not place any burden on the plaintiff to prove the claim she filed but shifts the burden to the defendant and essentially holds that an insurer can be guilty of a bad faith failure to pay a claim even though the alleged acts of bad faith occurred while the whole matter ofentitlement was in litigation, either in the trial court or in this Court, because it is undisputed that the majority opinion is premised upon the fact that Georgia Casualty did not pay to its insured the $110,000 of "stacked" coverage as soon as the certificate of judgment was entered by this Court in White I.
The majority states in its opinion:
 "Before his death, Mr. White filed this action to recover money due from Georgia Casualty under the uninsured motorist coverage of the policy that insured his employer's trucks. The issues regarding the worth of his claim, such as the extent of his injuries and the fault of the uninsured motorist, had been established before *Page 500 
this Court addressed the stacking issue in White I. The only determination left before Georgia Casualty was required to pay was whether Mr. White could stack; that issue was resolved in favor of Mr. White in White I. Before the judgment of this Court was certified, Mr. White died. At his death, the extent or worth of his claim was known to Georgia Casualty, and when this Court handed down its decision in White I, the amount Georgia Casualty was required to pay ($110,000) was established. When Mr. White died, his estate was the party entitled to be paid."
Op. at 490.
The majority's conclusion that Georgia Casualty should have paid its policy limits as soon as this Court issued its opinion in White I, when the plaintiff's entitlement to the full policy limits was not legally determined until the trial court granted the plaintiff's motion for summary judgment, is very disturbing. First, it is disturbing in that it misconstrues the holding of White I. The only issue decided in White I was the right of the insured to "stack" coverages, not the extent of the insured's damages.
That issue was not finally resolved against Georgia Casualty until Georgia Casualty failed to appeal from the summary judgment entered some nine months after the certificate of judgment was issued in White I, and while plaintiff's contract claim, on which she had demanded a jury trial, was still pending, along with other claims. Second, the decision is disturbing in that it permits a party who has been substituted in a representative capacity to file an amendment alleging a tort claim and to have it relate back, when the only claim to which it could relate is a tort claim that was filed by the deceased, a claim that was dismissed.
The majority states the following:
 "The other bad faith claim against Georgia Casualty was its alleged bad faith refusal to pay the total amount allowed by stacking after this Court's decision in White I. Georgia Casualty contends that this claim is also barred by Mr. White's death prior to the filing of the amendment raising this claim. However, because the conduct of Georgia Casualty alleged to give rise to the estate's claim of bad faith refusal to pay occurred after Mr. White's death, we conclude that the death of Mr. White does not affect whether the claim was properly brought by his estate, the entity Georgia Casualty was required to pay.
 "Before his death, Mr. White filed this action to recover money due from Georgia Casualty under the uninsured motorist coverage of the policy that insured his employer's trucks. The issues regarding the worth of his claim, such as the extent of his injuries and the fault of the uninsured motorist, had been established before this Court addressed the stacking issue in White I. The only determination left before Georgia Casualty was required to pay was whether Mr. White could stack; that issue was resolved in favor of Mr. White in White I. Before the judgment of this Court was certified, Mr. White died. At his death, the extent or worth of his claim was known to Georgia Casualty, and when this Court handed down its decision in White I, the amount Georgia Casualty was required to pay ($110,000) was established. When Mr. White died, his estate was the party entitled to be paid.
 "Assuming, without deciding, that after this Court's decision in White I and the death of Mr. White, Georgia Casualty had no reason to withhold payment, the claim for bad faith refusal to pay lies with Mr. White's estate, the party that Georgia Casualty was required to pay."
Op. at 490.
That holding is erroneous for at least the following reasons: (1) the record shows, without question, that there had not been a legal determination of Georgia Casualty's obligation to pay the $110,000 until the trial court entered its order in December 1988, based on a motion for summary judgment on the contract claim, filed by the plaintiff, in her representative capacity; and (2) the bad faith claim upon which the judgment was entered did not survive. *Page 501 
Admittedly, the question of Mr. White's right to stack coverages had been determined when this Court issued its certificate of judgment in White I, but the majority's conclusion that "[t]he issues regarding the worth of [Mr. White's] claim, such as the extent of his injuries and the fault of the uninsured motorist, had been established before this Court addressed the stacking issue in White I," Op. at 490, is inaccurate. If that statement is true, the plaintiff should have asked this Court to render a judgment in White I
and order the payment of the policy limits. On the other hand, if the plaintiff could prove entitlement to the full amount of the coverage, the plaintiff should have filed a motion for summary judgment on the contract claim as soon as proof could be made to show that no material issue of fact remained in the case. Georgia Casualty should not be penalized for the plaintiff's lack of diligence. I believe that the Court establishes a dangerous precedent in saying that the insurer should have paid a claim that was pending in court, even though the plaintiff had taken no official action to have it paid.
Our opinions in Quick v. State Farm Mut. Auto. Ins. Co.,429 So.2d 1033 (Ala. 1983), Bowers v. State Farm Mut. Auto. Ins.Co., 460 So.2d 1288 (Ala. 1984), and Aetna Cas. Sur. Co. v.Beggs, 525 So.2d 1350 (Ala. 1988), are direct authority for holding that "there can be no breach of an uninsured motorist contract, and therefore no bad faith, until the insured proves that he is legally entitled to recover [damages from an uninsured or underinsured motorist]." Quick, 429 So.2d at 1035.
The majority also concludes, even though the trial court correctly dismissed the fraud claim that had been filed against Georgia Casualty, that "in this case, where the extent of liability and the extent of injury had been determined before the death of the insured, [that is sufficient] to convert the contract for insurance into a contract for payment, and facts sufficient to state a cause of action for bad faith refusal to pay have been alleged," and "that the estate, the party entitled to be paid, can maintain an action for bad faith refusal to pay." Op. at 491. That is new law that I believe runs afoul of the principles of law set forth in McDowell v.Henderson Mining Co., 276 Ala. 202, 160 So.2d 486 (1963).
Assuming that the personal representative of an estate can maintain an action for bad faith failure to pay an insurance claim, as the majority holds,[4] I fail to see how the amendment to the complaint in this case constituted a suit by the estate.
It appears to me that the amendment was filed by the personal representative on behalf of Mr. White and that it alleged wrongful conduct on behalf of Georgia Casualty after his death.
This Court's decision allowing the amendment establishes a dangerous precedent relating to the survivability of tort claims, and permits a personal representative to stand in the shoes of a tort plaintiff who has died, and state a claim for wrongful conduct allegedly committed against the tort plaintiffafter his death. As I construe Rule 15(c), A.R.Civ.P., an amendment relates back only when the claim asserted (here, failure to pay the $110,000 after this Court decided White I) arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading (misrepresenting that the coverages could not be stacked).
Even if the personal representative had a cause of action against Georgia Casualty for refusal to pay, it would appear to me that it would have to be filed as a separate action, not as an amendment to a pending action. Otherwise, the law relating to survivability of tort claims and the procedural rules relating to pleadings and parties would be confused.
In any event, I do not believe that Georgia Casualty's failure to pay the contract claim that was pending in court awaiting trial by jury was conduct, even if wrongful, *Page 502 
that would relate back to alleged bad faith conduct occurring before Mr. White died, and as stated above, until the trial court granted the motion for summary judgment on the contract claim, Georgia Casualty was not under a legal obligation to pay.
From the beginning, I have been concerned that the tort of bad faith refusal to pay may not have been the best alternative for this Court to adopt. Nevertheless, the tort of bad faith has been established, and it is now the law of this state, but the opinion issued today expands the tort to include conduct that I believe was not envisioned when the tort was created. I also believe that the opinion establishes some procedural law relating to the survivability of tort claims that is a departure from current law. Those are the reasons for my dissent.
Even though I dissent on the law, I would agree to permit this plaintiff a reasonable attorney fee for the time and effort required to establish entitlement to the amount finally awarded on the contract claim. See my special concurrence inAetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1054 (Ala. 1987).
[1] See Ex parte Georgia Cas. Sur. Co., 531 So.2d 838, 840 (Ala. 1988), the mandamus case, in which Georgia Casualty contended that the fraud claims were extinguished by the decision inWhite I.
[2] The record suggests that there was some evidence that the kidney disease that caused Mr. White's death may have been a preexisting condition, and there was evidence that he did return to work. I realize that the trial court, after the plaintiffs produced evidence in support of their motion for summary judgment, did grant that motion, and that Georgia Casualty did not appeal, but that does not mean that summary judgment was appropriate. We frequently reverse summary judgments.
[3] In view of the fact that the trial court entered an order pursuant to Rule 54(b), Ala.R.Civ.P., the order in favor of the plaintiffs became final when Georgia Casualty did not appeal. Consequently, any dispute Georgia Casualty might have had relating to the extent of Mr. White's damages related to the policy coverage was foreclosed when no appeal was taken.
[4] I have not researched the law to determine whether a personal representative can file a bad faith claim, and I do not know to whom any punitive damages in such a case would be distributed, in view of the laws that regulate the receipt and distribution of funds belonging to the estate.