This case involves the plaintiffs' claims for breach of contract and bad faith.
The plaintiffs, Mrs. Frances Burns and Mr. L.D. Burns, purchased a used automobile from Gordon White Motors in Cuthbert, *Page 826 
Georgia on August 25, 1981. The plaintiffs financed the vehicle through GMAC. At the time of their purchase of the automobile, the plaintiffs purchased an insurance policy from Motors Insurance Corporation Life Insurance Company (hereinafter M.I.C.) for the purpose of insuring themselves from default on the automobile in the event that they were unable to meet their car payments because of death or disability.
At the time of the plaintiffs' purchase of the automobile, Mr. Burns was already totally disabled due to "brown lung" disease. Additionally, the trial transcript reveals that Mrs. Burns had previously been diagnosed and treated for a condition known as convulsion epilepsy. Mrs. Burns was treated for this condition by her family physician, Dr. Philip Woodbury, as early as February 2, 1981.
On February 8, 1982 Mrs. Burns lost her job due to a disability which affected her ability to work, as well as to a slow down in work. She thereafter filed a claim with M.I.C. for benefits pursuant to the provisions of the policy. The record and testimony reveal that M.I.C. thereafter made six car payments under its policy over a period of four months. On July 21, 1982 M.I.C. wrote Mrs. Burns a letter in which it informed her that it no longer considered her disabled under the provisions of its policy. M.I.C. also informed the plaintiffs that it had discontinued payments on her claim as of May 28, 1982. M.I.C. left Mrs. Burns's file open for re-evaluation and, on December 15, 1982, again notified her that it would not make further payments on the automobile. On December 19, 1983 M.I.C. circulated an interoffice letter indicating the reasons for its refusal to make any further payments on the automobile. Mr. and Mrs. Burns's automobile was repossessed by GMAC on December 7, 1983 after they were unable to make the car payments. At the time their car was repossessed, the plaintiffs owed a balance of $5,724.26. M.I.C. closed the file and concluded that no further payments would be made under the insurance policy.
On January 13, 1984 the plaintiffs filed suit against both GMAC and M.I.C., seeking damages of $750,000 for outrage, bad faith, and breach of contract. On December 3, 1985 the trial court entered partial summary judgment for both defendants on the plaintiffs' bad faith and outrage counts. The trial court also granted summary judgment for defendant GMAC on plaintiffs' contract count and dismissed GMAC as a party defendant.
The plaintiffs' remaining claim, their contract claim against defendant M.I.C., was tried in December 1986 in the Circuit Court of Jefferson County, Alabama. At the close of the plaintiffs' case, both the plaintiffs and defendant M.I.C. filed motions for directed verdicts on the plaintiffs' contract claim. The record reveals that both motions were denied. The defendant then rested without calling any witnesses and renewed its motion for a directed verdict. The motion was again denied. The jury subsequently returned a $5,724.26 verdict for the plaintiffs, and the trial court entered judgment on the verdict.
The plaintiffs now appeal from this judgment and assert that the trial court erred in granting summary judgment for defendant M.I.C. on their bad faith claim. The plaintiffs also contend that the trial court erred in refusing to instruct the jury on the issue of whether damages for mental anguish were recoverable on their contract claim. We note that the plaintiffs have failed to raise on appeal the trial court's entry of summary judgment on their outrage claim.
Defendant M.I.C., on the other hand, contends that the trial court erred in failing to grant its motion for a directed verdict on the plaintiffs' contract claim and in failing to grant its motion for a mistrial.
 I. Plaintiffs' Bad Faith Claim
As previously stated, the plaintiffs assert that the trial court erred in granting defendant M.I.C.'s motion for summary judgment on the bad faith claim. We disagree.
In National Security Fire Casualty Co. v. Bowen,417 So.2d 179 (Ala. 1982), our *Page 827 
supreme court held that the elements of a prima facie case of bad faith were:
 "(a) [A]n insurance contract between the parties and a breach thereof by the defendant;
 "(b) an intentional refusal to pay the insured's claim;
 "(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
 "(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
 "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
See, National Security Fire Casualty Co. v. Bowen, supra.
The Alabama Supreme Court has also held that the "no lawful basis" element of the tort constitutes the insurer's utter lack of any "legitimate or arguable reason for failing to pay the claim." See, Gulf Atlantic Life Insurance Co. v. Barnes,405 So.2d 916 (Ala. 1981). Finally, the existing law of bad faith has always recognized the fact that when a first-party claim is even debatable the insurer is within its legal right in debating it, regardless of whether the debatable issue concerns factual or legal matters. Gulf Atlantic Life Insurance Co. v.Barnes, supra. Therefore, in order to establish prima facie bad faith, a plaintiff must demonstrate far more than the mere nonpayment of his or her claim. The plaintiff must show that the insurer's decision not to pay was without any ground for dispute. In other words, the insurer had no legal or factual defense to the claim. In order to accomplish this, the insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim. See, National Security Fire Casualty Co. v. Bowen, supra.
Having thus stated the framework of Alabama's tort of bad faith, we now turn to the facts of the present case.
The testimony in the record reveals that M.I.C.'s claims process involved the initial submission of a death or disability claim for payment. If the claim was supported by sufficient medical or physician's reports, M.I.C. would pay the claim for a period of about six months and then re-evaluate it. The testimony in the record reveals that if a claim, after being reevaluated, still evidenced the insured's disability, M.I.C. would pay the balance of the loan payments due and close the file.
In the present case plaintiff Frances Burns lost her job and submitted a claim for loan payment benefits to defendant M.I.C. Mrs. Burns's claim was accompanied by the statement of her attending physician, Dr. Philip Woodbury. Dr. Woodbury's evaluation stated that Mrs. Burns was totally disabled due to syncope, anxiety, depression, and epilepsy. M.I.C. thereafter began paying monthly car payments to GMAC, and made six payments over the course of four months. However, as previously noted it was M.I.C.'s common practice to leave many of its claims files open for re-evaluation.
M.I.C. subsequently re-evaluated Mrs. Burns's claim. During the course of its re-evaluation of the claim, M.I.C. obtained the evaluations of two independent physicians; however, neither physician was willing to fully agree with Dr. Woodbury's initial evaluation. Testimony at trial elicited from Mr. H.R. Prantl, M.I.C.'s branch manager charged with the responsibility of handling claims, indicated that it was M.I.C.'s policy to liquidate the entire amount of a claim and close its files only after being presented with evidence that all evaluating physicians unanimously concurred in the initial diagnosis regarding the claimant's disability.
As previously stated, M.I.C.'s follow-up evaluation demonstrated that it could find no physician other than Dr. Woodbury who was willing to classify Mrs. Burns as "totally disabled" within the meaning of the policy. For this reason, M.I.C. refused to continue payments on Mrs. Burns's claim.
M.I.C. subsequently re-evaluated the claim. During its second re-evaluation, it sent Mrs. Burns to a third physician, Dr. Stephen R. Bryan. Dr. Bryan stated that, *Page 828 
in his opinion, Mrs. Burns was functional. Thereafter, M.I.C. again denied the claim on the basis that Mrs. Burns was not disabled.
M.I.C. subsequently re-evaluated the claim for a third time. While in the course of its third evaluation of Mrs. Burns's claim, M.I.C. received Dr. Woodbury's medical records regarding Mrs. Burns. Dr. Woodbury's records demonstrated that he had treated Mrs. Burns for epilepsy as early as February 2, 1981, almost seven months prior to Mrs. Burns's purchase of the automobile and the corresponding insurance policy.
At the time Mrs. Burns purchased the automobile and M.I.C. policy, she signed a "good health" statement which stated: "I am now in good health and have not within the past three months consulted or been under the care of a doctor or other practitioner. . . ." After receiving Dr. Woodbury's medical records revealing that Mrs. Burns had been under his care for almost seven months prior to her purchase of the policy, the insurer again denied coverage and closed the file. After its final denial, however, it stated that it was denying coverage because of Mrs. Burns's "pre-existing condition."
The trial court granted the defendants' motion for summary judgment on the bad faith and outrage claims. Under our scintilla rule, summary judgment is proper for a defendant when there is no genuine issue of material fact as to any element in the plaintiff's claim, and the defendant is entitled to judgment as a matter of law. See, Wilson v. Brown,496 So.2d 756 (Ala. 1986).
Our review of the record in the present case reveals that at the time of M.I.C.'s initial denial of the plaintiffs' claims, it was undisputed that a binding insurance contract existed between the parties and that the insurer had intentionally refused to pay a claim arising under the contract. Did the insurer, however, have a legitimate reason to debate the claim? The trial court held that it did, and we agree.
As previously noted, M.I.C.'s claims process required re-evaluations of all claims every six months. M.I.C. made the six car payments under its insurance contract with the plaintiffs before re-evaluating the claim. Upon re-evaluating the claim, M.I.C. determined that none of the other physicians to whom it sent Mrs. Burns were able to affirmatively concur with Dr. Woodbury's conclusion that Mrs. Burns was totally disabled. M.I.C. then declined to make any further payments on the claim. Upon subsequent evaluations, M.I.C. received a report from a physician who stated that he felt Mrs. Burns was functional. M.I.C. once again declined to make further payments on the claim. Upon conducting a third evaluation, M.I.C. learned that Mrs. Burns had previously been treated for epilepsy, yet had signed a "good health" statement indicating that she had not previously been under a doctor's care.
Based upon this evidence, there were, as a matter of law, arguable or legitimate reasons for M.I.C. to debate the validity of Mrs. Burns's claim that she was totally disabled on the first two instances in which it denied coverage. The debatable reasons in both of these instances are evidenced by the fact that the insurer was unable to conclusively determine, pursuant to its own claims process, whether Mrs. Burns was fully disabled. On the third instance in which M.I.C. denied coverage, the record reveals that coverage was denied because it was learned that Mrs. Burns had misrepresented the fact that she was in good health at the time she purchased the policy when, in fact, Mrs. Burns was already suffering from, and had previously been treated for, epilepsy. Thus, as a matter of law, M.I.C. possessed a legitimate reason for denying coverage on the third occasion because Mrs. Burns made a misrepresentation regarding her good health which might have enabled the insurer to avoid liability under the insurance contract. See, Inglish v. United Services General Life Co.,394 So.2d 960 (Ala.Civ.App. 1980); see also, § 27-14-7, Code 1975. Because M.I.C. possessed debatable reasons for denying the claim on each instance in which Mrs. Burns's claim was denied, it cannot be liable for bad faith. *Page 829 
 II. Plaintiffs' Damages for Mental Anguish
The plaintiffs also appeal from the trial court's refusal to charge the jury on the issue of whether their damages for mental anguish were properly recoverable under their contract claim.
As a general rule, mental anguish is not a recoverable element arising out of a claim for breach of contract. NationalSecurity Fire Casualty Co. v. Vintson, 414 So.2d 49 (Ala. 1982). The Alabama Supreme Court, however, has enumerated various exceptions to this general proposition. See, B MHomes, Inc. v. Hogan, 376 So.2d 667 (Ala. 1979). The exception discussed in the Hogan case is that damages for mental anguish are properly recoverable in a breach of contract case only when there is evidence that the breaching party could reasonably foresee that its breach would cause mental distress to the nonbreaching party. See, B M Homes, Inc. v. Hogan, supra; seealso, Hill v. Sereneck, 355 So.2d 1129 (Ala.Civ.App. 1978).
The plaintiffs assert that their damages for mental anguish were reasonably foreseeable by the insurer at the time of its refusal to pay their claim because they were a disabled couple who had only one automobile and because they relied upon their use of that automobile to go to and from their doctor and pharmacists.
Our review of the testimony at trial, however, reveals no evidence which tends to create an inference that either M.I.C. or its claims personnel knew that both Mr. and Mrs. Burns were disabled. In fact, the entire reason that this case is being litigated is because M.I.C. possessed evidence leading it to believe that Mrs. Burns was not fully disabled. Nor does our review of the evidence indicate that M.I.C. either knew or should have known that Mr. and Mrs. Burns possessed only the car which it insured.
Therefore, we hold that this case does not fit within the exception contained in our opinion in Hill v. Sereneck, supra.
For this reason, the trial court properly denied the plaintiffs' requested jury charge concerning the recovery of damages for mental anguish on the contract claim.
 III. Defendant's Motion for Directed Verdict
Defendant M.I.C., in its brief, asserts that the trial court erred in refusing to grant its motion for a directed verdict on the plaintiffs' contract claim.
At this point, however, we note that defendant M.I.C. failed to raise this issue in a cross appeal as provided by Rule 4 (a)(2), Alabama Rules of Appellate Procedure. For this reason we are precluded from reviewing this issue. See, Johnson v.Salter, 359 So.2d 417 (Ala.Civ.App. 1978).
However, even if this issue had been properly raised, we would nonetheless be precluded from reviewing whether a scintilla of evidence existed to support the denial of defendant's motion for a directed verdict because defendant failed to move for jnov. Our cases have previously held that in absence of a posttrial motion for jnov, we are unable to review the sufficiency of the evidence to determine whether a party established a jury question on any particular issue. See,Deatherage v. Walker, 387 So.2d 845 (Ala.Civ.App. 1980); seealso, Great Atlantic Pacific Tea Co. v. Sealy, 374 So.2d 877
(Ala. 1979). Therefore, for both of the reasons set out above, we pretermit further discussion of this issue.
 IV. Mistrial
Defendant M.I.C. also raises as an issue the trial court's refusal to grant a mistrial during the course of the trial.
We refuse to address this contention also, because it was not raised in the form of a cross-appeal. See, Johnson v. Salter,supra; Rule 4 (a)(2), A.R.A.P.
 V. Conclusion
We, therefore, affirm the trial court's grant of summary judgment on plaintiffs' bad faith claim and affirm the trial court's denial of plaintiffs' requested jury charge *Page 830 
regarding the recovery of damages for mental anguish.
AFFIRMED.
HOLMES and INGRAM, JJ., concur.