This is an uninsured motorist case. The insured, James LeFevre, presents three issues on appeal to this Court: (1) whether he is entitled to recover damages for the alleged bad faith of State Farm Mutual Automobile Insurance Company ("State Farm"); (2) whether he is entitled to recover advance payments under his policy providing uninsured motorist benefits pending a final determination of the extent of his loss, and (3) whether he is entitled to recover interest on the tendered policy limits.
 FACTS
In July 1988 LeFevre was injured in an automobile accident with an uninsured motorist. At that time, he was covered under a policy of automobile insurance issued by State Farm that provided uninsured motorist coverage with liability limits of $50,000.
On July 6, the day following the accident, LeFevre's wife reported the accident to State Farm. State Farm opened a claim file and assigned the file to Lamar Westberry, its claims representative. After Westberry contacted both LeFevre and the uninsured motorist, he submitted a report to his supervisor, Richard Hardy, in which Westberry stated that "[LeFevre] was hit head-on by [the] adverse [party] on [the] wrong side [of the road]."[1]
Over the course of the next 15 months, Westberry received various reports from the Decatur Orthopaedic Clinic regarding *Page 156 
LeFevre's physical injuries. The first report from the clinic indicated that his injuries consisted of a nondisplaced fracture of the right tibial plateau and a soft tissue injury to his right foot. In December, the reports indicated that LeFevre had to have further surgery on his ankle. In response to this progress report, Hardy suggested that Westberry obtain a statement from the witness to the accident, and "reserve U[ninsured motorist benefits] up to $10,000."
After he contacted the witness, Westberry relayed to Hardy that the witness stated that the uninsured motorist was speeding, crossed over the center line, and collided head-on with LeFevre's automobile. At that point, Hardy recommended an increase in the uninsured motorist reserve to $30,000.
When LeFevre returned to the clinic in March, the doctor reported that he "seemed to be doing fairly well" and that the foot "is a lot better than it was before surgery but these deformities will persist."
Approximately four months later, the orthopaedic clinic report indicated that LeFevre had a 50% loss of function of the foot and that he continued to have complications that possibly would require a "BK" (below the knee) amputation.
In August 1989, Westberry reported to Hardy that State Farm had paid over $14,000 for LeFevre's medical expenses under the first-party medical payments provisions of the policy and suggested that State Farm should pay the $50,000 limit on the uninsured motorist claim. Hardy extended the authority to expend $50,000 to settle the claim, but suggested that Westberry first offer to settle for $40,000.
Westberry offered $45,000 to Ed McCormick, LeFevre's son-in-law, to settle the claim. Ultimately, in October 1989, Westberry offered the policy limits to settle the claim, and requested that LeFevre sign a release. Upon tender of the policy limits, LeFevre's attorney requested that State Farm pay interest on the uninsured motorist benefits. State Farm refused to pay interest on the benefits, and informed LeFevre that he could not receive his benefits unless he agreed to execute the release.
In November 1989, LeFevre sued State Farm, seeking damages for breach of contract, bad faith refusal to pay a direct claim, and intentional infliction of emotional distress. The trial court entered a summary judgment in favor of State Farm. LeFevre appeals. Although the complaint claims damages for breach of contract, intentional infliction of emotional distress, and bad faith, the issues raised on appeal concern only State Farm's alleged bad faith failure to pay the claim. Accordingly, all other issues have been waived. See Boyle v.Scheer, 512 So.2d 1336 (Ala. 1987).
 HISTORY OF UNINSURED MOTORIST COVERAGE
In 1966, the Alabama Legislature joined a growing number of states in enacting legislation mandating that insurers offer uninsured motorist coverage to persons insured under automobile liability policies issued by the insurer. 1965 Ala. Acts 866 (codified at Ala. Code 1975, § 32-7-23). The policy of compensation underlying the statute was "to provide financial recompense to innocent persons who are injured and to dependents of those who are killed because of the wrongful conduct of uninsured motorists." State Farm Auto. Ins. Co. v.Reaves, 292 Ala. 218, 284, 292 So.2d 95, 100 (1974) (quotingGulf Am. Fire Cas. Co. v. Gowan, 283 Ala, 480, 483,218 So.2d 688, 691 (1969).
The uninsured motorist statute, as amended, requires that, to be entitled to uninsured motorist benefits, the insured be "legally entitled to recover" damages from the owner or operator of the uninsured automobile:
 "(a) No automobile liability or motor vehicle policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided *Page 157 
therein or supplemental thereto . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, that the named insured shall have the right to reject such coverage. . . ."
Ala. Code 1975, § 32-7-23.
The policy sued upon in this case incorporates substantially the language of the statute emphasized above and requires that the insured prove he is "legally entitled" to recover damages:
 "We will pay damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle.
". . . .
"Deciding Fault and Amount
 "Two questions must be decided by agreement between the insured and us:
 "1. Is the insured legally entitled to collect
damages from the owner or driver of the uninsured motor vehicle, and
"2. If so, in what amount?
 "If there is no agreement, these questions shall be decided by arbitration if requested in writing by the insured." (Emphasis added.)
Before we can determine whether the insured has stated a claim against State Farm for bad faith failure to pay, we must first determine if LeFevre has proven that he is "legally entitled to collect"; that language of the policy is consistent with the statutory language. What do the words "legally entitled to collect" mean?
In Quick v. State Farm Mut. Auto. Ins. Co., 429 So.2d 1033
(Ala. 1983), the Court noted that "legally entitled to recover as damages" has been interpreted to mean that "the insured mustbe able to establish fault on the part of the uninsured motorist, which gives rise to damages and must be able to provethe extent of those damages." Id. at 1035 (quoting State FarmMut. Auto. Ins. Co. v. Griffin, 51 Ala. App. 426, 431,286 So.2d 302, 306 (1973)) (emphasis added in Quick). See State FarmAuto. Ins. Co. v. Baldwin, 470 So.2d 1230 (Ala. 1985) (citingWinner v. Ratzlaff, 211 Kan. 59, 505 P.2d 606 (1973);Application of Travelers Indemnity Co., 226 N.Y.S.2d 16
(N.Y.Sup. 1962); Cox, Uninsured Motorist Coverage, 34 Mo.L.Rev. 1, 34 (1969)).
In Quick, State Farm acknowledged that the Quicks were "entitled to some payment under the uninsured motorist coverage and that the only matter to be resolved is the amount of payment." The Quicks alleged that they were entitled to punitive damages against State Farm based upon an alleged bad faith refusal to pay their claim. The Court affirmed a summary judgment for State Farm on the basis that it was undisputed that there was a debatable issue as to the amount due under the uninsured motorist coverage. The facts of Quick are substantially like those presented here.
Clearly, the insured, LeFevre, was entitled to some payment under the uninsured motorist coverage of the State Farm policy, but the total amount of that entitlement was not capable of being fully ascertained as of the date State Farm receivednotice of the claim. In other words, as of that date LeFevre had failed to "prove the extent of those damages" in order to become "legally entitled to collect damages from the owner or driver of the uninsured motor vehicle." Our research reveals that several other jurisdictions have adopted a similar uninsured motorist coverage statute and have dealt with policy provisions in regard to uninsured motorist coverage either identical to or similar to that contained in our statute. See Widiss, Uninsured Motorist Coverage § 7.2 (1990); Hughes v.State Farm Mut. Auto. Ins. Co., 604 F.2d 573, 575-76 (8th Cir. 1979); see also Allstate Ins. Co. v. Elkins, 63 Ill. App.3d 62,66, 21 Ill.Dec. 66, 69, 381 N.E.2d 1, 4 (1978) (concluding that the words "legally entitled to recover" mean that "the plaintiff must be able to establish fault on the part of the uninsured motorist which gives rise to damages" and not that "the insurer stands in the shoes of the uninsured motorist who is the tortfeasor"); Allied Fidelity Ins. Co. v. Lamb,361 N.E.2d 174, 180 (Ind.App. 1977) (the words " 'legally entitled to recover' *Page 158 
simply mean that the insured may recover from an insurer . . . only after establishing that the uninsured motorist is at fault"); Winner v. Ratzlaff, 211 Kan. 59, 64, 505 P.2d 606
(1973) ("We construe the words 'legally entitled to recover as damages' to mean that the insured must be able to establish fault on the part of the uninsured motorist which gives rise to damages and to prove the extent of those damages"); Satzingerv. Satzinger, 156 N.J. Super. 215, 220, 383 A.2d 753, 755
(Ch.Div. 1978) ("In this contest, the term 'legal entitlement' is synonymous with the factual issue of fault"); DeLuca v.Motor Vehicle Accident Indemnification Corp., 17 N.Y.2d 76, 81,215 N.E.2d 482, 484, 268 N.Y.S.2d 289, 292 (1966) ("the phrase 'legally entitled' means and denotes fault"). In Georgia and a few other states, however, the claimant must bring an action and obtain a judgment against the uninsured motorist as a condition precedent to recovery under the policy. ContinentalIns. Co. v. Echols, 145 Ga. App. 112, 113, 243 S.E.2d 88, 89-90
(1978); Lawson v. Porter, 256 S.C. 65, 68, 180 S.E.2d 643, 644
(1971); Glover v. Tennessee Farmers Mut. Ins. Co., 225 Tenn. 306,312-13, 468 S.W.2d 727, 730 (1971); Rodgers v. Danko,204 Va. 140, 142-43, 129 S.E.2d 828, 830 (1963).
The Court in Quick, construing the statutory language, concluded:
 "[T]here can be no breach of an uninsured motorist contract, and therefore no bad faith, until the insured proves that he is legally entitled to recover. We opine that the trial court correctly ruled in favor of defendant State Farm on the bad faith claim, as the evidence proves that the amount of damages had not been determined."
429 So.2d at 1035.
The Court reaffirmed Quick in Aetna Casualty Surety, Inc.v. Beggs, 525 So.2d 1350 (Ala. 1988). In Beggs, the plaintiff's husband was killed in an accident with an uninsured motorist. At the time of the accident, the plaintiff had an automobile policy with Aetna that covered the automobile involved in the accident and provided approximately $20,000 in uninsured motorist coverage.
Approximately two months after the accident Aetna offered $10,000 under the uninsured motorist claim. The plaintiff countered with a demand for $20,000, to which Aetna responded with an offer of $15,000. Seven months after the accident, the plaintiff sued Aetna, alleging bad faith. Two months after suit was filed, Aetna decided to pay its policy limits of $20,000. The trial resulted in a jury verdict against Aetna on the bad faith claim in the amount of $100,000. This Court reversed, citing Quick. The Court noted in Beggs that there was no offer of proof by the plaintiff of the amount of the insurer's liability under the uninsured motorist provision until the trial of the case. Justice Houston wrote for the Court:
 "[I]t is doubtful that an insured could ever prove the amount of an insurer's liability under uninsured motorist coverage in a wrongful death case with the specificity necessary to recover against an insurer for bad faith in failing to negotiate or pay a wrongful death claim under uninsured motorist coverage."
Id. at 1352-53.
We apply the same reasoning the Court applied inBeggs to resolve the question of whether State Farm acted with bad faith in failing to pay LeFevre's uninsured motorist claim, even though this case does not involve the wrongful death statute and the nature of the damages are different. Undoubtedly, in some cases the insured could prove the amount of the insurer's liability with the specificity necessary to recover against an insurer for bad faith; however, in personal injury cases similar to the case at hand, where the insured's injuries at first appear to be nominal and then gradually worsen, the insurer cannot be held liable for damages on a bad faith claim for failing to anticipate what even the physicians did not predict.
In order to recover on a claim alleging bad faith refusal to pay on a direct claim, the insured must prove: (1) the existence of an insurance contract; (2) an intentional refusal to pay the claim; and (3) the *Page 159 
absence of any lawful basis for the refusal and the insurer's knowledge of that fact or the insurer's intentional failure to determine whether a lawful basis exists for its refusal.Quick.
The plaintiff bears a heavy burden. National Sav. Life Ins.Co. v. Dutton, 419 So.2d 1357, at 1362 (Ala. 1982). In order to establish a prima facie case of bad faith, a plaintiff must demonstrate far more than the mere delay in payment of his or her claim:
 "The plaintiff must show that the insurer's decision not to pay was without any ground for dispute. In other words, the insurer had no legal or factual defense to the claim. In order to accomplish this, the insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim."
Burns v. Motors Ins. Corp., 530 So.2d 824, 827 (Ala.Civ.App. 1987) (citing National Security Fire Cas. Co. v. Bowen,417 So.2d 179 (Ala. 1982)).
The general policy consideration that underpins our recognition of a redressable tort in the case of an intentional breach of good faith in the context of first-party insurance contracts is that:
 " 'The law will not allow an insurer to wilfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need.' "
Chavers v. Nat. Sec. Fire Cas. Co., 405 So.2d 1, 6 (Ala. 1981) (quoting Vincent v. Blue Cross-Blue Shield of Alabama,373 So.2d 1054, 1067 (Embry, J., dissenting)). Chavers did not involve an uninsured motorist policy, however, and in Quick, the Court noted the differences inherent in the uninsured motorist coverage situation:
 "[T]here is an inherent difference in uninsured motorist coverage and first party insurance. The provisions of uninsured motorist coverage reorder the normal postures between an insured and an insurer. Thus, until the liability of the uninsured motorist has been determined, the insurer and insured occupy an adversary position toward each other."
429 So.2d at 1035.
Uninsured motorist coverage in Alabama is a hybrid in that it blends the features of both first-party and third-party coverage. The first-party aspect is evident in that the insured makes a claim under his own contract. At the same time, however, third-party liability principles also are operating in that the coverage requires the insured to be "legally entitled" to collect — that is, the insured must be able to establish fault on the part of the uninsured motorist and must be able to prove the extent of the damages to which he or she would be entitled. The question arises: when is a carrier of uninsured motorist coverage under a duty to pay its insured's damages?
There is no universally definitive answer to this question or to the question when an action alleging bad faith may be maintained for the improper handling of an uninsured or underinsured motorist claim; the answer is, of course, dependent upon the facts of each case. Clearly, there is a covenant of good faith and fair dealing between the insurer and the insured, as with direct insurance, but the insurer and the insured occupy adverse positions until the uninsured motorist's liability is fixed; therefore, there can be no action based on the tort of bad faith based on conduct arising prior to that time, only for subsequent bad faith conduct.
There are several jurisdictions that reject extension of the bad faith doctrine to uninsured motorist coverage. The first case to reject such a claim was Lyon v. Hartford Accident Indem. Co., 25 Utah 2d 311, 480 P.2d 739 (1971). The plaintiff in that case argued that Hartford had failed to bargain with her and that, as a result, she was compelled to incur legal expenses in pursuit of her claim. She contended that Hartford had acted in bad faith and that she should be compensated for the legal fees she incurred. The Utah Supreme Court refused to analogize to the third-party situation. The court, instead, *Page 160 
pointed out that the insurer and the insured were adversaries.[2]
In Baxter v. Royal Indemnity Co., 285 So.2d 652
(Fla.Dist.Ct.App. 1973), the insured again advanced the bad faith theory when the insured had earlier demanded the full uninsured motorist benefits in settlement; the company had refused to pay the demand, but an arbitration award gave the insured the full policy limits. The court rejected the bad faith argument for the following reasons:
 1) There is no fiduciary relationship in the uninsured motorist situation as is created in the third-party situation where the insurer can expose its insured to an excess verdict;
 2) in the uninsured motorist context, the uninsured motorist carrier becomes, in effect, the insurer of the uninsured;
 3) the parties in the uninsured motorist situation are contractually and, in reality, wholly adverse to each other;
 4) the insurance contract lawfully allows the parties to settle any uninsured motorist dispute by submitting the matter to arbitration. As a result, a party, in this case the insurer, cannot be subjected to a tort when it exercises its contractual option to arbitrate regardless of the insurer's motives; and
 5) the insured need not wait for the insurer. The insured can invoke the arbitration clause at any time.
Id. at 655-57.
In Quick, the Court, relying on Baxter, also discussed the inherent differences between the third-party and uninsured motorist coverages. The Court pointed out that until the insured proves fault on the part of the uninsured motorist and the amount of the insured's damages, the insurer and the insured are adverse to each other.
The question, of course, is how must an insured establish his or her entitlement to recover? Clearly, the legislature did not intend that the insured would have to sue and receive a judgment in his or her favor before bringing an action alleging bad faith. Griffin, 51 Ala. App. 426, 286 So.2d 302. In cases such as this, where the evidence of the extent of damages is disputed, the insured has not proven, of course, that he is "legally entitled to collect"; therefore, one of the elements of proof necessary to support an action for bad faith is missing. Although some states have not permitted claims for bad faith failure to pay uninsured motorist benefits, the law in Alabama seems to support the application of the doctrine of bad faith to uninsured motorist coverage, but our cases seem to recognize the adversarial relationship created by the uninsured motorist coverage and to recognize that the adversarial relationship should not be diminished to the point of turning the coverage into something more like a first-party coverage than what it was designed to be.
Heretofore, this Court has not clearly defined the procedures an insurer must follow when its insured has notified it of a claim under the uninsured/underinsured motorist coverage provision of an automobile liability policy. The need is apparent, therefore, for some procedure that will allow the insurer to aggressively defend the claim and attempt to defeat the claim, or at least to minimize the size of the award, while concomitantly fulfilling the duties imposed on it by law and the obligations *Page 161 
imposed on it by its contract with the insured.
We now undertake to provide, as we did in Lambert v. StateFarm Mut. Auto. Ins. Co., 576 So.2d 160 (Ala. 1991), some guidelines for everyone concerned to follow, applying what the legislature intended so that an insured will receive the benefits of the bargain the insured has made, but guidelines that will, at the same time, protect the insurer's rights to refuse to pay a claim it is not legally required to pay.
Any procedure, of course, must take into consideration the facts and circumstances of each case, but the following general rules should apply:
 1. When a claim is filed by its insured, the uninsured motorist carrier has an obligation to diligently investigate the facts, fairly evaluate the claim, and act promptly and reasonably.
 2. The uninsured motorist carrier should conclude its investigation within a reasonable time and should notify its insured of the action it proposes with regard to the claim for uninsured motorist benefits.[3]
 3. Mere delay does not constitute vexatious or unreasonable delay in the investigation of a claim if there is a bona fide dispute on the issue of liability.
 4. Likewise, mere delay in payment does not rise to the level of bad faith if there is a bona fide dispute on the issue of damages.
 5. If the uninsured motorist carrier refuses to settle with its insured, its refusal to settle must be reasonable.[4]
We now apply these guidelines to the facts of this case. In the present case, LeFevre's wife reported his claim to State Farm on the day following the accident. State Farm's claims representative immediately began investigating the claim, contacting LeFevre, the uninsured motorist, and a witness, obtaining reports from the orthopaedic clinic, and submitting progress reports to his supervisor. At all times State Farm continued to pay LeFevre's medical expenses.
For a period of approximately 15 months, State Farm received various conflicting reports on the extent of Lefevre's damages. The first report indicated that LeFevre had sustained a fracture to his right foot. Five months later, he had further surgery on the ankle. When he returned to the clinic three months after the surgery, the doctor reported that he "seemed to be doing fairly well." Approximately four months later, the orthopaedic clinic report indicated that LeFevre had a 50% loss of function of the foot and that he continued to have complications that possibly would require amputation. At that point, State Farm offered $45,000 to settle the claim, which was refused. Two months later, State Farm offered the policy limits to settle the claim.
In addition to these conflicting medical reports, we note that the record does not reveal any evidence that the insured requested a specific amount of benefits under his uninsured motorist policy. Furthermore, *Page 162 
LeFevre offered no proof of the amount of State Farm's liability under the uninsured motorist provision until after State Farm had tendered its entire policy limits. Not even at the time for consideration of the summary judgment motion did LeFevre offer evidence that the claim had a value exceeding $50,000.[5]
Alabama has imposed a rather heavy burden on a bad faith claimant; a cause of action for bad faith arises only "where the insurer has acted with an intent to injure." King v.National Found. Life Ins. Co., 541 So.2d 502, 505 (Ala. 1989);Alfa Mut. Ins. Co. v. Smith, 540 So.2d 691 (Ala. 1988). In the present case, LeFevre has not presented sufficient evidence to prove that State Farm acted with an intent to injure him by delaying the offer of the entire policy limits until the damages were conclusively ascertained.
Based on the foregoing, the trial court correctly ruled in favor of State Farm, because, after applying the guidelines we here establish, we hold that the record reveals a legitimate dispute between the insurer and its insured relating to the amount of liability of the uninsured motorist.
In summary, the insured, LeFevre, bore the burden of proving a lack of insurance on the part of the tort-feasor; the tort-feasor's legal liability; proximate cause; and damages. See Howard v. Alabama Farm Bureau Mut. Cas. Ins. Co.,373 So.2d 628 (Ala. 1979). LeFevre proved each element except the extent of his damages.
According to our caselaw, "[t]here can be no breach of an insured motorist contract, and therefore no bad faith, until the insured proves that he is legally entitled to recover [damages from the uninsured motorist]." Quick,429 So.2d at 1035. In the present case, because there was a legitimate dispute concerning the amount of damages, we hold that there was no evidence of bad faith on the part of State Farm in failing to tender the entire policy limits for approximately 15 months, and that the trial court correctly entered the summary judgment in favor of State Farm.
 PERIODIC PAYMENTS
LeFevre next contends that State Farm acted in bad faith in refusing to make advance payments under the uninsured motorist coverage provision of the policy.
The parties are in dispute as to whether LeFevre ever made a request for advances. However, this factual issue did not preclude the summary judgment, because, even assuming that such a request was made, State Farm had no contractual obligation to make advance payments under the facts of this case. State Farm's duties and obligations are determined by the terms of the policy, which makes no provision for unconditional periodic payments.
LeFevre admits that the policy itself does not provide for advance payments, but asserts that the obligation of good faith and fair dealing supersedes the actual terms of the policy. We have found no Alabama case, nor have we been cited to one, where, in the context of good faith and fair dealing, the question of unconditional payments has been discussed. Thus, we hold that the written terms of the contract govern. This Court is not at liberty to read into a policy of insurance something that is not there. See Altiere v. Blue Cross Blue Shield ofAlabama, 551 So.2d 290 (Ala. 1989). Therefore, we hold that LeFevre's bad faith claim cannot be predicated upon State Farm's failure to make advance payments.
 INTEREST
Last, LeFevre contends that State Farm acted in bad faith in refusing to pay interest on the amount ultimately agreed to be due under the policy. Granting State Farm's motion for summary judgment on this point, the trial court stated: *Page 163 
 "It is the opinion of this court that because of the many variables involved in evaluating and agreeing upon a settlement involving compensation for personal injuries that the amount, if any, owed by the defendant under the uninsured motorist coverage of plaintiff's insurance policy was not capable of being ascertained at the time State Farm received notice of the claim and that no prejudgment interest is or was due to plaintiff."
We conclude that the trial court did not err. In general, there is a statutory right to interest on the amount payable under any type of insurance policy. Ala. Code 1975, § 8-8-8;Thomas v. Liberty Nat'l Life Ins. Co., 368 So.2d 254 (Ala. 1979). However, for the insured to be entitled to interest, the amount due under the policy must be a liquidated sum. LeFevre is not entitled to prejudgment interest on his policy. SeeState Farm Mut. Auto. Ins. Co. v. Reaves, 292 Ala. 218,292 So.2d 95 (1974); see also State Farm Mut. Auto. Ins. Co. v.Bradley, 293 Ala. 695, 309 So.2d 826 (1975).
For the foregoing reasons, the judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
HORNSBY, C.J., and ADAMS and STEAGALL, JJ., concur.
HOUSTON, J., concurs specially.
ALMON, J., concurs in the result.
[1] The police report indicated that the accident occurred when the uninsured motorist lost control of his automobile and slid into the path of LeFevre's automobile, striking that vehicle headon.
[2] The Court in Lyon considered only the question of whether a claim of bad faith gave rise to a tort cause of action; to the extent that Lyon is philosophically inconsistent with a recognition of a cause of action in contract, it was overruled by Beck v. Farmers Ins. Exchange, 701 P.2d 795 (Utah 1985).
In Beck the Court held that there is a good faith duty to bargain or settle under an insurance contract, but that violation of that duty gives rise to a claim for breach of contract.
In its recognition of the contractual obligation of good faith, the Court refuses to analogize the duty owed in a third-party situation to that owed in a first-party context:
 "In the [third-party] situation, the insurer must act in good faith and be as zealous in protecting the interest of the insured as it would be in regard to its own. In the [first-party] situation, the insured and the insurer are, in effect and practically speaking, adversaries."
Beck at 799, quoting from Lyon, 25 Utah 2d at 319,480 P.2d at 745.
[3] Other jurisdictions have been faced with the same issues regarding the obligation to act in good faith in handling claims. A three-month delay in raising a settlement proposal to policy limits was held insufficient to establish bad faith by a California court of appeals. Blough v. State Farm Fire Cas.Co., 203 Cal.App.3d 1260, 250 Cal.Rptr. 735 (1988). A one-year delay in denial of a fire loss claim did not constitute vexatious or unreasonable delay where evidence of arson presented a bona fide dispute on the issue of liability. Darkv. United States Fidelity Guar. Co., 175 Ill. App.3d 26, 124 Ill.Dec. 681, 529 N.E.2d 662 (1988). Even in Alabama we rejected the claim that the mere delay in settlement for a seven-month period on a hospitalization claim amounted to bad faith, absent proof of a bad faith refusal or lack of a reasonable basis to withhold payment. Pierce v. Combined Ins.Co., 531 So.2d 654 (Ala. 1988).
[4] In United Services Auto. Ass'n v. Allen, 519 So.2d 506 (Ala. 1988), the insured sought an injunction to prevent his carrier of underinsured motorist coverage from withholding its consent to the insured's settlement with the underinsured tort-feasor's insurer. The trial court granted the injunction, and this Court affirmed. This Court found that "there was nothing in the record . . . to show that USAA had a reasonable basis for withholding its consent." The Court held that a refusal of a carrier of underinsured motorist coverage to consent to settle must be reasonable, and that it was not reasonable in that case.
[5] The only proof offered as to the amount the insured would be entitled to recover was the affidavit of Mr. Adams (an attorney), offered in opposition to the motion for summary judgment filed by the defendants. That affidavit was filed over one year after State Farm had tendered the policy limits, and it merely indicated that the "value" of the claim in February 1989 was two to three times the medical expenses, or somewhere between $24,000 and $42,000.