CRAWLEY, Presiding Judge.
Billy Smith was injured in an automobile accident on May 2, 1997. Smith was insured by two State Farm Mutual Automobile Insurance Company (“State Farm”) automobile-insurance policies that provided a combined total of $50,000 in uninsured/underinsured-motorist (“UM/UIM”) coverage. The driver of the automobile that collided with Smith’s vehicle was insured; her policy limits were $25,000, which were paid to Smith. Smith sought payment of the policy limits of his UM/ UIM coverage from State Farm; State Farm refused to pay Smith any UM/UIM benefits. Smith sued State Farm, alleging breach of contract and bad-faith failure to *1165 pay his UM/UIM claim. The case proceeded to trial, at which State Farm sought a judgment as a matter of law (“JML”) on the bad-faith claim both at the close of Smith’s evidence and at the close of all the evidence; both motions were denied. The jury returned a verdict in favor of Smith and against State Farm on the bad-faith claim in the amount of $25,000.[1] After its postjudgment motion for a JML was denied, State Farm appealed, arguing that the bad-faith claim should never have been submitted to the jury and, thus, that it was entitled to a JML on that claim.
“[T]his court reviews the trial court’s action [on a motion for a JML] using the same standard used by the trial court in initially granting or denying the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 8 (Ala.1997). Regarding questions of fact, the issue is whether the nonmovant presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmov-ant must present ‘substantial evidence’ in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). In reviewing a ruling on a motion for a JML, this court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Motion Indus., Inc. v. Pate, 678 So.2d 724 (Ala.1996).”
City of Mobile v. Taylor, 938 So.2d 407, 409 (Ala.2005).
The record reveals the following facts. Smith was not transported to the emergency room after his May 2, 1997, accident. He went to see his family doctor, Dr. John Jernigan, on May 6, 1997. He reported to Dr. Jernigan that he had been in an accident, that his neck continued to hurt, and that he had noticed a tingling down his left arm and some loss of strength in that arm as well. Dr. Jernigan concluded that Smith had a simple cervical strain, but he recommended an MRI to rule out any significant injury. The MRI, which was performed on May 15, 1997, revealed a small herniated disk at the C3-C4 level, according to Dr. Robert P. Ei-chelberger, the radiologist who interpreted the MRI. Dr. Jernigan testified that Smith’s symptoms, especially the tingling and numbness in his left arm, were consistent with a herniated disk and that a herniated disk can be caused by an automobile accident.
Dr. Jernigan referred Smith to Dr. Warner L. Pinchback, an orthopedic surgeon, for evaluation and treatment of the herniated disk. Dr. Pinchback treated Smith conservatively, relying on physical therapy to alleviate Smith’s symptoms. The physical-therapy notes reveal that Smith followed his physical-therapy regimen and that he saw an increase in range of motion, strength, and generalized function at the completion of therapy on June 20, 1997. The notes also indicate that the therapist had noted a decrease in subjective complaints of pain and discomfort from Smith since the start of therapy. Dr. Pinchback released Smith on June 23,1997, indicating in his records that Smith’s symptoms had improved and that he would not have any permanent impairment from the injury.
However, according to Dr. Jernigan, although the physical therapy helped Smith *1166 a great deal, it did not resolve all of his pain. Dr. Jernigan testified that, because Smith continued to complain of pain, in October 1997 he referred Smith to Dr. Patrick Ryan, a neurosurgeon, who recommended that Smith undergo surgery. Dr. Jernigan’s medical records, however, do not include any record of Smith continuing to complain of pain from the herniated disk; nor do his records reveal that he referred Smith to Dr. Ryan in October 1997. In fact, Dr. Jernigan’s notes on Smith’s July 10, 1997, visit for a follow up on treatment for sinusitis indicate that Smith’s neck was “doing fine” and that Smith “occasionally ha[d] a little tingling pain down the left arm.” Dr. Jernigan’s next note is dated September 30, 1998.
Dr. Ryan examined Smith on October 29, 1997. According to Dr. Ryan’s note from that date, Smith reported that the jar to his neck from the accident was quite severe and that he had pain in his neck that radiated into his left arm. Smith complained to Dr. Ryan of continued neck pain and left-shoulder and arm pain. Dr. Ryan concluded that Smith would require surgery to repair what he referred to as a “quite large” disk herniation.
Smith’s UM/UIM claim was originally assigned by State Farm to Reggie Hurst; when Hurst was transferred within the company, Glenn Childress took over Smith’s claim. Childress’s main responsibility was to gather necessary information for assessing the claim. To that end, he sought from Smith’s attorney copies of Smith’s medical records and photographs of Smith’s damaged automobile. He submitted the information he gathered to Chad Carter, State Farm’s auto-claims team manager, who oversaw the handling of Smith’s claim and who ultimately made the decision not to pay Smith any UM/ UIM benefits.
Carter testified that his decision not to pay any UM/UIM benefits to Smith was based on his consideration of several factors. He noted that Smith had waited four days to seek treatment for his neck; that the May 1997 MRI was reported by Dr. Eichelberger to show only a small herniation; that Smith had reported to Dr. Jerni-gan that his automobile had sustained a large amount of damage; that Smith had told Dr. Pinchback that he “did not think much of the accident when it happened”; that after treatment by Dr. Pinchback and completion of physical therapy, Dr. Pinch-back released Smith, indicating that Smith was “doing fine” and that he saw “no long standing issues” relating to Smith’s injury; that a period of four to five months elapsed between Smith’s release from Dr. Pinchback and his appointment with Dr. Ryan; that Smith told Dr. Ryan that his automobile sustained a severe impact; and that Dr. Ryan suggested in his records that Smith had a large herniation instead of a small herniation as described by Dr. Eichelberger. Carter explained that he felt that proximate cause was an issue in the case and that, based on his experience, Smith’s ease was likely worth approximately $15,000. Because that amount was less than the amount of the insurance settlement that Smith had received from the other driver, Carter did not authorize the payment of any UM/UIM benefits to Smith.

The General Law of Bad Faith

In Ex parte Simmons, 791 So.2d 371, 378-79 (Ala.2000), our supreme court discussed both “normal” and “abnormal” bad-faith failure to pay insurance benefits:
“In Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968 (Ala.1998), we stated:
“ ‘[National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982)] set out these requirements for *1167 a plaintiff to prove a bad-faith failure to pay:
“ ‘ “(a) an insurance contract between the parties and a breach thereof by the defendant;
“ ‘ “(b) an intentional refusal to pay the insured’s claim;
“ ‘ “(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
“ ‘ “(d) the insurer’s actual knowledge of the absence of any legitimate or arguable reason;
“ ‘ “(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.”
“ ‘417 So.2d at 183. Requirements (a) through (d) represent the “normal” case. Requirement (e) represents the “abnormal” case.
“ ‘The rule in “abnormal” cases dispensed with the predicate of a prever-dict JML [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation. Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661 (Ala.1995); Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990). A defendant’s knowledge or reckless disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured. Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981).
“ ‘So, a plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a “normal” case, or, failing that, can prove that the insurer’s failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive.’
“732 So.2d at 976 (footnote omitted).”
Smith argues that State Farm’s refusal to pay him UM/UIM benefits amounts to “abnormal bad faith” because State Farm failed to adequately investigate his claim or to submit the results of that investigation to cognitive evaluation and review. Smith also argues that State Farm created its own debatable reason for failing to settle his claim. However, the evidence reveals that Carter did evaluate Smith’s claim by considering the medical records of his physicians. Smith appears to be arguing that, because State Farm did not dispute that the accident occurred or the fact that he either suffered a herniated disk or aggravated a preexisting herniated disk in the accident, its position that it should not to pay him any UM/UIM benefits is untenable. However, State Farm has consistently maintained that it questioned whether Smith’s need for surgery was truly caused by the accident. That is, State Farm contested whether the accident proximately caused the full extent of Smith’s injuries. We do not agree with Smith that State Farm “created” a debatable reason to deny Smith’s claim, that State Farm failed to investigate Smith’s claim, or that State Farm failed to subject its decision not to pay UM/UIM benefits to cognitive evaluation and review. State Farm had a legitimate reason to dispute the extent of Smith’s damages resulting from the May 1997 accident. Thus, we conclude that Smith did not present sub *1168 stantial evidence of “abnormal bad faith” on the part of State Farm.

Bad Faith in the UM/UIM Context

State Farm argued to the trial court and argues on appeal that its decision not to pay any UM/UIM benefits to Smith could not have amounted to bad faith because Smith had not established that he was legally entitled to collect from the other driver damages above and beyond the $25,000 settlement he had already received from the other driver’s insurer. Our supreme court has on several occasions considered when a UM/UIM insurance carrier’s failure to pay benefits to its insured can amount to bad faith. See Pontius v. State Farm Mut. Auto. Ins. Co., 915 So.2d 557 (Ala.2005); Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149 (Ala.2001); LeFevre v. Westberry, 590 So.2d 154 (Ala.1991); Bowers v. State Farm Mut. Auto. Ins. Co., 460 So.2d 1288 (Ala.1984); and Quick v. State Farm Mut. Auto. Ins. Co., 429 So.2d 1033 (Ala.1983). In Quick, the court stated that “there can be no breach of an uninsured motorist contract, and therefore no bad faith, until the insured proves that he is legally entitled to recover.” Quick, 429 So.2d at 1035. The court explained that to show that he was “legally entitled to recover,” an insured must establish that the uninsured motorist was at fault and legally liable for damages and must also prove the extent of those damages. Id.
Because in Quick there existed a question regarding the amount of benefits due under the policy, i.e., a question regarding the damages to which the insured was entitled, the supreme court affirmed a summary judgment in favor of the insurer on the insured’s bad-faith claim. Id. The supreme court affirmed a summary judgment in favor of the insurer on its insured’s bad-faith claim in Bowers as well, stating that a fact question regarding liability existed because the uninsured motorist had sued the insured, alleging that the driver of the insured’s car had been negligent in causing the collision; the Bowers court stated that the insurer “had a clear right to delay its payment [of uninsured-motorist benefits] until its liability was established.” Bowers, 460 So.2d at 1290.
The supreme court further explained the reasoning behind the rationale employed in Quick and Bowers in LeFevre. Relying in large part on language from Quick, the court noted the difference between first-party insurance coverage and uninsured-motorist coverage:
“ ‘[TJhere is an inherent difference in uninsured motorist coverage and first party insurance. The provisions of uninsured motorist coverage reorder the normal postures between an insured and an insurer. Thus, until the liability of the uninsured motorist has been determined, the insurer and insured occupy an adversary position toward each other.’
“[Quick,] 429 So.2d at 1035.
“Uninsured motorist coverage in Alabama is a hybrid in that it blends the features of both first-party and third-party coverage. The first-party aspect is evident in that the insured makes a claim under his own contract. At the same time, however, third-party liability principles also are operating in that the coverage requires the insured to be ‘legally entitled’ to collect — that is, the insured must be able to establish fault on the part of the uninsured motorist and must be able to prove the extent of the damages to which he or she would be entitled. The question arises: when is a carrier of uninsured motorist coverage under a duty to pay its insured’s damages?
*1169 “There is no universally definitive answer to this question or to the question when an action alleging bad faith may be maintained for the improper handling of an uninsured or underinsured motorist claim; the answer is, of course, dependent upon the facts of each case. Clearly, there is a covenant of good faith and fair dealing between the insurer and the insured, as with direct insurance, but the insurer and the insured occupy adverse positions until the uninsured motorist’s liability is fixed; therefore, there can be no action based on the tort of bad faith based on conduct arising prior to that time, only for subsequent bad faith conduct.”
LeFevre, 590 So.2d at 159 (emphasis added). The court then outlined guidelines to govern an insurer’s handling of an uninsured-motorist claim by its insured:
“Any procedure, of course, must take into consideration the facts and circumstances of each case, but the following general rules should apply:
“1. When a claim is filed by its insured, the uninsured motorist carrier has an obligation to diligently investigate the facts, fairly evaluate the claim, and act promptly and reasonably.
“2. The uninsured motorist carrier should conclude its investigation within a reasonable time and should notify its insured of the action it proposes with regard to the claim for uninsured motorist benefits.
“3. Mere delay does not constitute vexatious or unreasonable delay in the investigation of a claim if there is a bona fide dispute on the issue of liability.
“4. Likewise, mere delay in payment does not rise to the level of bad faith if there is a bona fide dispute on the issue of damages.
“5. If the uninsured motorist carrier refuses to settle with its insured, its refusal to settle must be reasonable.”
Id. at 161 (footnotes omitted; emphasis added).
The facts of LeFevre are similar to those in the present case: at first, the insured’s injuries were characterized as minor; however, over time, the injury worsened. The insured in LeFevre had a fractured foot. LeFevre, 590 So.2d at 161. Later the insured required surgery, which, at first, appeared to have benefited the insured but subsequently resulted in complications that required an amputation of the insured’s leg below the knee. Id. Noting that the insurer received conflicting reports on the extent of the insured’s damages, our supreme court commented that the insured had not proven the extent of his damages at the time that the insurer received notice of and considered the claim and that the insured had not demonstrated that “ ‘the insurer has acted with an intent to injure.’ ” Id. at 161-62 (quoting King v. National Found. Life Ins. Co., 541 So.2d 502, 505 (Ala.1989)). The court held, therefore, that the insurer could not be liable for bad faith because “the record reveals a legitimate dispute between the insurer and the insured relating to the amount of liability of the uninsured motorist.” Id. at 162.
In the present case, Carter was provided information that indicated that Smith’s neck injury was a minor cervical strain that appeared to resolve over a short span of time with conservative treatment. A few months later, Smith sought surgery for the same injury, despite there being no record of continued complaints by Smith to Dr. Jernigan or Dr. Pinchback. Thus, Carter evaluated the claim and considered that Smith’s injury might not have resulted solely from the May 1997 accident. Be *1170 cause Carter felt that a legitimate basis for disputing the amount of damages to which Smith was entitled to as a result of the accident existed, he did not authorize the payment of any of the UM/UIM benefits potentially available to Smith under his policies. The evidence Smith adduced at trial, which established that his need for surgery did result from the May 1997 accident, was not substantial evidence indicating that State Farm’s decision not to authorize payment of Smith’s available UM/ UIM benefits amounted to bad faith.
Because Smith had not established the extent of his damages and because State Farm disputed whether all the damages claimed by Smith were attributable to the May 1997 accident, State Farm’s decision not to authorize payment of all or part of Smith’s UM/UIM benefits could not have amounted to bad faith. Accordingly, State Farm was entitled to a JML on Smith’s bad-faith claim. The trial court’s judgment denying State Farm’s postjudgment JML is reversed, and the cause is remanded for the trial court to enter a judgment in favor of State Farm on Smith’s bad-faith claim.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON and PITTMAN, JJ., concur.
MURDOCK and BRYAN, JJ., concur in the result, without writing.

. The jury also found in favor of Smith and against State Farm on Smith’s breach-of-contract claim; however, State Farm did not appeal that aspect of the judgment, which is not relevant to the resolution of this appeal.